CASE NO. 16-20069

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

AMMAR ALKHAWALDEH
*Plaintiff-Appellant,*

v.

DOW CHEMICAL COMPANY
*Defendant-Appellee.*

_____

On Appeal from the United States District
Court Southern District of Texas
District Court No. 4:14-CV-4022
Honorable Lynn N. Hughes, Presiding

_____

**APPELLANT'S REPLY BRIEF**

_____

Joseph Y. Ahmad
Texas Bar No. 00941100
Ahmad, Zavitsanos, Anaipakos,
Alavi & Mensing, P.C.
1221 McKinney St., Suite 2500
Houston, Texas 77010
Telephone: (713) 655-1101
Facsimile: (713) 655-0062
Email: joeahmad@azalaw.com

ATTORNEY FOR APPELLANT
AMMAR ALKHAWALDEH

**August 1, 2016**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................ i

TABLE OF AUTHORITIES ................................................................ iv

I.   INTRODUCTION .......................................................................... 1

II.  ARGUMENT ................................................................................. 2

   A.   Dr. Alkhawaldeh Established a Causal Connection Between
        His Complaints and the Termination of his Employment .................... 2

        1.   The Timing Establishes a Causal Connection .......................... 4

             a.   Hook seeks a transfer for Dr. Alkhawaldeh .................... 5

             b.   For the first time, Hook criticizes Dr.
                  Alkhawaldeh's performance ........................................... 5

             c.   Dr. Alkhawaldeh seeks a response to his complaint ....... 7

             d.   Dr. Alkhawaldeh is suspended ...................................... 7

             e.   Dr. Alkhawaldeh complains of the
                  retaliatory treatment ................................................... 7

             f.   Dr. Alkhawaldeh files with the EEOC ........................... 8

             g.   Dow Immediately Schemes to Terminate
                  Dr. Alkhawaldeh ......................................................... 10

             h.   Dr. Alkhawaldeh files an Amended Charge
                  with the EEOC ............................................................ 10

             i.   Dr. Alkhawaldeh declines to resign and
                  completes his PIP ........................................................ 11

j.    Dow uncovers similar conduct taken by
Hook against other employees ........................................ 12

k.    Dow proceeds to terminate Dr. Alkhawaldeh ............... 12

2.    Dr. Alkhawaldeh Has Additional Evidence
of a Causal Connection ............................................................ 12

a.    Dow management acknowledge their negative
attitude toward Dr. Alkhawaldeh because
of his complaints ............................................................ 13

b.    Dow's decision makers admit that Dr. Alkhawaldeh
was fired because of his complaints .............................. 13

c.    The EEOC rejects Dow's story and finds in
Dr. Alkhawaldeh's favor ................................................ 14

B.    There are Numerous Questions of Fact Concerning
Dow's Articulated Reason for Termination ....................................... 15

1.    Prior to His Complaints, Dr. Alkhawaldeh
was an Excellent Performer ..................................................... 15

a.    Dr. Alkhawaldeh Achieves what Others Could Not ...... 15

b.    Dow Praised Dr. Alkhawaldeh's Qualification and
Work Performance in Support of his I-140 Petition ...... 16

c.    Dow Supports Dr. Alkhawaldeh's Application
for an O-1 Visa Because of his
"Extraordinary Abilities" ................................................ 16

d.    Dow Applies for Permanent Residency
for Dr. Alkhawaldeh ...................................................... 17

   e. Dow Offers No Credible Explanation for the
    Sudden Shift of View of Performance after
    Dr. Alkhawaldeh's complaints ...................................... 18

   f. Hook Never Documented Any Performance
    Issues Prior to Dr. Alkhawaldeh's Complaints ............. 18

  2. Dr. Alkhawaldeh's completion of the PIP demonstrated
   satisfactory performance at the time of termination ................ 20

 C. The District Court Improperly Found No Similarly
  Situated Comparators .......................................................... 22

 D. The Same Actor Inference is Not Applicable .................................... 23

CONCLUSION.................................................................................. 24

CERTIFICATE OF SERVICE .............................................................. 25

CERTIFICATE OF COMPLIANCE....................................................... 26

# Cases

*Brown v. CSC Logic*,
  82 F.3d 651 (5th Cir. 1996) .................................................................... 21, 22

*Carrera v. Comm. Coating Servs. Int'l, Ltd.*,
  422 F. App'x 334, 339 (5th Cir. 2000) ........................................................ 5

*Fierros v. Texas Dept. of Health*,
  274 F.3d 187 (5th Cir. 2001) ...................................................................... 5

*Heinsohn v. Carabin & Shaw, P.C.*,
  Docket No. 15-50300 (5th Cir. July 28, 2016) ........................................... 18

*Ibrahim v. City of Houston*,
  2009 U.S. Dist. LEXIS 31735, *70 (S.D. Tex. April 15, 2009) ................... 22

*Jackson v. Birmingham Bd. of Educ.*,
  544 U.S. 167 (2005) ..................................................................................... 5

*Minor v. Alcatel USA Res., Inc.*,
  2007 U.S. Dist. LEXIS 31894, *20 (E.D. Tex., May 1, 2007) ..................... 5

*Russell v. McKinney Hosp. Venture*,
  235 F.3d 219 (5th Cir. 2000). .................................................................... 22

*Staub v. Proctor Hospital*,
  131 S.Ct. 1186 (2011). ............................................................................... 21

# Statutes

Title VII, 42 U.S.C. § 2000e, *et seq.* ...............................................*passim*

# I.
# INTRODUCTION

In its Brief, Dow asserts two primary reasons for affirming summary judgment. First, Dow claims that Dr. Alkhawaldeh cannot establish a *prima facie* case of retaliation. In support of this argument, Dow claims that the length of time between Dr. Alkhawaldeh's complaints of discrimination and his termination is too long to establish a causal connection. In addition, Dow argues that Dr. Alkhawaldeh has no additional evidence of a connection between his complaints and the termination of his employment. In fact, the opposite is true. Dr. Alkhawaldeh has evidence of both a close temporal proximity as well as additional evidence establishing the connection between his protected activity and his termination.

As a fallback position, Dow claims that in the event that Dr. Alkhawaldeh can establish a *prima facie* case of retaliation, that he has insufficient evidence of pretext. In that regard, Dow claims that Dr. Alkhawaldeh was terminated for "poor performance." However, to be clear, Dow has zero objective evidence of poor performance by Dr. Alkhawaldeh. The only evidence Dow has of poor performance is the subjective statements of his supervisor, Bruce Hook, who was the primary subject of Dr. Alkhawaldeh's complaints, and was informed of all of his complaints, including the two EEOC Charges that Dr. Alkhawaldeh filed shortly before he was terminated. Dow has not offered a shred of evidence of poor

performance prior to Dr. Alkhawaldeh complaining of discriminatory treatment in the workplace.   In other words, the only evidence, including both written documentation and oral statements, arose after Dr. Alkhawaldeh complained to Dow.

Moreover, Dr. Alkhawaldeh has refuted each and every subjective statement made by Dow regarding the alleged "poor performance."  He even successfully completed the Performance Improvement Plan on which Hook had put him after his complaints.  Faced with these facts, along with the fact that immediately prior to his complaints Dr. Alkhawaldeh was highly revered as a supreme performer valued by Dow, a jury could easily reject Dow's claim and conclude that Dr. Alkhawaldeh was in fact terminated because of his discrimination and retaliation complaints.  Therefore, the District Court's summary judgment must be reversed.

## II.
## ARGUMENT

### A.    Dr. Alkhawaldeh Established a Causal Connection Between His Complaints and the Termination of his Employment

In its Brief, Dow concedes that Dr. Alkhawaldeh engaged in protected activity during his employment.   However, Dow argues that Dr. Alkhawaldeh cannot establish a causal connection between his protected activity and the termination of his employment in September 2010.  In support, Dow claims that there was a seven-month difference between the time that Dr. Alkhawaldeh

2

initially complained, and the time that he was terminated.  Thus, according to Dow, this seven month time difference is too great a time period to establish a causal connection.

Dow's claim in this regard is seriously flawed for a couple of reasons.  First, Dow is ignoring the fact that immediately following Dr. Alkhawaldeh's initial complaints, Hook started a series of events that were designed to force Dr. Alkhawaldeh out of the company.  The fact that Dow did not accomplish the termination until September 2010 is of no consequence.  The reality is that the evidence establishes an unlawful motive for the treatment of Dr. Alkhawaldeh immediately after he opposed discriminatory conduct in the workplace.  Moreover, Dow ignores the fact that during Dr. Alkhawaldeh's employment, he complained of and opposed additional, separate and distinct violations of Title VII, which included two Charges of Discrimination filed by him during his employment, that show a causal connection and prove that the complaints played a role in the decision to terminate.  As shown below, when considering all aspects of his complaints, and how his complaints were received by management, the decision to terminate Dr. Alkhawaldeh's employment was arguably made one day after he raised a discrimination and retaliation complaint with the top Human Resources official in the US, and, at the very longest, was terminated merely four months after his initial Charge of Discrimination, and three months following his Amended

Charge.   This evidence, in and of itself, establishes a *prima facie* case of retaliation.

### 1.    The Timing Establishes a Causal Connection

After joining Dow in January 2008, Dr. Alkhawaldeh attended Six Sigma training in November 2009—close to his two-year anniversary with the company. During the training, Dr. Alkhawaldeh experienced what he believed to be two separate incidents of discrimination from two instructors, Phil Rudolf and Steve Passmore.

The following day, Dr. Alkhawaldeh complained to his supervisor, Bruce Hook, about the incidents he had experienced.   ROA.710; ROA.834-835.   In response to Dr. Alkhawaldeh's complaints, Hook told Dr. Alkhawaldeh that he was being overly sensitive and was over reacting to the comment.   ROA.898-899. Hook also told Dr. Alkhawaldeh, "When you come from the part of the world where you come from, there is a perception, and the perception is reality and you have to accept that."   ROA.710; ROA.834-835.   When Dr. Alkhawaldeh responded that he felt that Rudolf's comments were discriminatory and the attitude was not right, Hook threw some papers at Dr. Alkhawaldeh and told him to leave Hook's office.   ROA.710.   Later that day, Dr. Alkhawaldeh filed a complaint about Passmore's conduct with Dow's Director of Ethics & Compliance, David Wilkins. ROA.707-708; ROA.760-762.

In its Brief, Dow argues that Dr. Alkhawaldeh's initial complaints in November 2009 were not protected.  Presumably, Dow make this argument because Hook issued Dr. Alkhawaldeh the negative performance evaluation in response to these complaints, and does not want to be caught retaliating against Dr. Alkhawaldeh for protected activity.  In making this argument, Dow overlooks that fact that under the opposition clause of Title VII, an internal complaint by an employee, even if made informally, is protected activity.  42 U.S.C. § 2000e-3(a); *see also Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005); *Fierros v. Texas Dept. of Health*, 274 F.3d 187, 194 (5th Cir. 2001); *Carrera v. Comm. Coating Servs. Int'l, Ltd.*, 422 F. App'x 334, 339 (5th Cir. 2000); *Minor v. Alcatel USA Res., Inc.,* 2007 U.S. Dist. LEXIS 31894, *20 (E.D. Tex., May 1, 2007) (holding that an employee need not necessarily use the terms "discrimination" in the complaint, if it is apparent that complaints are based on a protected characteristic).  Here, there is no question that Dr. Alkhawaldeh was complaining to Hook of discrimination based on a protected characteristic.   ROA.710; ROA.834-835 (Dr. Alkhawaldeh complaining of "discriminatory" treatment).

### a.    Hook seeks a transfer for Dr. Alkhawaldeh

Following Dr. Alkhawaldeh's discrimination complaints, Hook's attitude toward Dr. Alkhawaldeh changed significantly and Hook began a series of actions designed to remove Dr. Alkhawaldeh from Hook's Department.  First, on January

22 and 23, 2010, Hook forwarded two internal Dow job postings in other departments to Dr. Alkhawaldeh.    ROA.763-770.   A few days later, on January 28, 2010, Phil Carlberg took Dr. Alkhawaldeh to lunch and informed him that Carlberg had spoken with Hook, and that Hook thought Dr. Alkhawaldeh should leave Dow and look for another job.  ROA.714-715.

### b.    For the first time, Hook criticizes Dr. Alkhawaldeh's performance

A couple of weeks later, in February 2010, Dr. Alkhawaldeh received his 2009 Performance Review from Hook.  ROA.440-447.  In the review, Hook rated Dr. Alkhawaldeh a "1," the lowest possible rating.  Hook also put Dr. Alkhawaldeh on a Performance Improvement Plan.  Dr. Alkhawaldeh was the only employee in Epoxy R&D to receive a "1" segmentation for 2009 and is the only employee that Hook has ever rated a "1" since Hook began working at Dow.   ROA. 935.  Similarly, Dr. Alkhawaldeh is also the only employee Hook ever placed on a Performance Improvement Plan.  ROA.935.

Given the blatant retaliatory nature of his performance evaluation, on February 8, 2010, Dr. Alkhawaldeh complained about his 2009 Performance Review to Ganesh Kailasam, West's boss and head of the entire R&D division at Dow.  ROA.458-466.  On February 12, 2010, Dr. Alkhawaldeh lodged a formal complaint against Hook with Bill Lewis, the HR Manager for the Freeport site,

David Wilkins, the Director of Dow's Ethics and Compliance Group, Marianne Besaw, a member of Dow's Ethics and Compliance Group, and Sharon Barnes, the HR representative for Kailasam's entire R&D group and the first point of contact for Epoxy R&D for complaints like Dr. Alkhawaldeh's. ROA.476-482. Dr. Alkhawaldeh arranged a meeting with Kailasam, West, and Barnes to discuss his complaints about his 2009 Performance Review. Notably, going into the meeting, Dow had no intention of taking any corrective action in response to Dr. Alkhawaldeh's complaints. Rather, the meeting was set up simply to allow him "to feel as though his side of the story was told and heard." ROA.1150.

### c. Dr. Alkhawaldeh seeks a response to his complaint

Predictably, following the meeting, Dr. Alkhawaldeh was told that the 2009 Performance Review would not be changed and that Dr. Alkhawaldeh was going to have to go on a PIP. ROA.1238-1239. Of course, this decision was made without Dow conducting any investigation into the accuracy of Dr. Alkhawaldeh's 2009 Performance Review or whether he was subjected to discrimination in the review process. Thus, Dr. Alkhawaldeh continued to press the issue, and on February 24, 2010, he asked for an explanation of Barnes' statement that Dr. Alkhawaldeh's ranking on the 2009 Performance Review would not be changed "no matter the outcome" of Dow's investigation. ROA.1238-1239. Dr. Alkhawaldeh's complaint about Hook was referred to Mike Dizer, Dow's Manager of HR Investigations.

### d.     Dr. Alkhawaldeh is suspended

Shortly thereafter, Dr. Alkhawaldeh was suspended from work.  He was not given any valid reason for his suspension.  ROA.1227-1228.  According to Barnes, Dr. Alkhawaldeh was suspended because Barns said it could be easier to perform an investigation when the complainant is not in the workplace.  ROA.1227-1228. Tellingly, Hook was not likewise suspended.  ROA.1228.

### e.     Dr. Alkhawaldeh complains of the retaliatory treatment

On March 17, 2010 Dr. Alkhawaldeh complained to Hook, West, and Lewis that the PIP was discriminatory and that Hook retaliated against him by putting him on a PIP.  ROA.814-815.  A couple of weeks later, on April 1, 2010, after Dr. Alkhawaldeh asked Hook why Dr. Alkhawaldeh had been asked to do two MOC's for a project instead of just one which was normal, Hook responded, "This is not Arabia. If you don't like it, go back and buy yourself a camel."   ROA.17; ROA.332.

### f.     Dr. Alkhawaldeh files with the EEOC

The following day, Dr. Alkhawaldeh filed a Charge of Discrimination ("Charge") with the EEOC alleging discrimination based on color and national origin.  ROA.568.  It is clear that Dow had no intention of investigating Dr. Alkhawaldeh's allegations.  Upon receiving the Charge, Barnes told Hook, the

EEOC will investigate, "however, I cannot imagine that they will substantiate his claims. Hang in there, Bruce… this too shall pass." ROA.1162.

On April 12, 2010, Dr. Alkhawaldeh emailed Hook, West, Dizer, and Lewis communicating that the PIP was being used as a tool to fire Dr. Alkhawaldeh and implement Hook's "discriminatory agenda" that he had been pursuing for the last year and a half. ROA.828-829. Dr. Alkhawaldeh also emailed Dizer, Rick Cassiday, Director of North American HR for Dow, Bill Lewis, and Jim Bailey, Barnes' boss and the HR head for R&D, criticizing Dizer's investigation stating that Dr. Alkhawaldeh had been requesting for months that HR intervene to end Hook's discriminatory, condescending, and intimidating behavior.

On May 4, 2010, Dr. Alkhawaldeh emailed Rick Cassiday. His email was titled "Discrimination Continues." ROA.579-581. The email began, "I am writing to you to seek your help to stop what I believe is a discriminatory behavior against me...." ROA.579-581. Dr. Alkhawaldeh made it clear that he believed the 2009 Performance Review was the beginning of a paper trail designed to unlawfully fire him. ROA.579-581. Dr. Alkhawaldeh asked Cassiday for a transfer to another department outside of Epoxy R&D. ROA.579-581. However, Cassiday rejected Dr. Alkhawaldeh's request, telling Dr. Alkhawaldeh that HR matters were best managed by the HR professionals and management at Dr. Alkhawaldeh's location. ROA.579-581.

### g.     Dow Immediately Schemes to Terminate Dr. Alkhawaldeh

The morning after receiving Dr. Alkhawaldeh's complaint, Cassiday emailed Dizer, Skaggs, Bailey, and Barnes suggesting "we convene a ERM [Employee Review Meeting] to review this situation and determine how to proceed." ROA.1169. According to Dow, the only purpose for an ERM is to terminate an employee. ROA.1209. The problem for Dow was, at that time, Dr. Alkhawaldeh was completing all of his PIP items." Therefore, Dow temporarily put the ERM on hold given that acting at that time would clearly show how blatantly retaliatory the termination would be.

### h.     Dr. Alkhawaldeh files an Amended Charge with the EEOC

On May 13, 2010, Dr. Alkhawaldeh filed an Amended Charge of Discrimination with the EEOC to add a retaliation claim, asserting that Hook was retaliating against Dr. Alkhawaldeh because of his complaints about color and national origin discrimination. ROA.583. In order to attempt to stop the retaliation to which he was clearly being subjected, Dr. Alkhawaldeh followed up his Amended Charge with a complaint on June 25, 2010 made to Dow Global Compliance. Just days later, Cassiday emailed Dizer, Barnes, Besaw, Gibson, Lewis and Sepesy about Dr. Alkhawaldeh's latest complaint to Dow's ethics line. In response, Barnes acknowledged that Hook's and Dr. Alkhawaldeh's leaders were "tired of this entire situation." ROA.1269. She also admitted in writing that

10

the situation had created some contention amongst folks in Midland – Dow's corporate headquarters.  ROA.1269.

### i.    Dr. Alkhawaldeh declines to resign and completes his PIP

In light of the friction caused by Dr. Alkhawaldeh's complaints, on July 1, 2010, Barnes asked Dr. Alkhawaldeh if he had any intention of leaving Dow.  Dr. Alkhawaldeh responded that he had no plans to leave Dow, that he was committed to Dow and to his work at Dow, and that he would continue to do his job.  Dr. Alkhawaldeh repeated his request to be transferred to work under a different supervisor.  In response to Dr. Alkhawaldeh's refusal to leave Dow, Barnes and West met with Dr. Alkhawaldeh.  At that meeting, Barnes told Dr. Alkhawaldeh that he had two options: (1) leave Dow with some financial assistance; or (2) be transferred to work under West's supervision until another position became available with Dow.  ROA.857.  Dr. Alkhawaldeh was also told that he was no longer on the Performance Improvement Plan and that until another position with Dow became available, he would be transferred, reporting directly to West. ROA.857.

After the meeting, Barnes emailed Mike Dizer, Jay Gibson, Marianne Besaw, Lisa Skaggs, Rick Cassiday, Jim Bailey, Bill Lewis, and Joe Sepesy an "Update" in which Dr. Alkhawaldeh stated as part of the summary of the meeting,

11

"The PIP has been declared as complete and [Dr. Alkhawaldeh] will now be allowed to perform on his own.  ROA.1168.

### j.     Dow uncovers similar conduct taken by Hook against other employees

Although Barnes reported that "All seems to be working well for now," on July 26, 2010, she told Gibson and Dizer about a discovery she had made: "I really think we need that external company to come and investigate.  From what I've heard, there have been others who have experienced some of this behavior from [Hook]. The[re] may have been people who we may have not talked to." ROA.1270.

### k.     Dow proceeds to terminate Dr. Alkhawaldeh

Curiously, no external company was ever brought in to perform an independent investigation.  Instead, just one month later, on September 2, 2010, Dow scheduled an ERM for September 13, 2010 to "discuss" Dr. Alkhawaldeh. Following the meeting, on September 28, 2010, Dr. Alkhawaldeh was terminated with an effective date of October 31, 2010.

### 2.     Dr. Alkhawaldeh Has Additional Evidence of a Causal Connection

As outlined above, the timing of events alone establishes that Dr. Alkhawaldeh was fired because of his repeated opposition to the discrimination and retaliation to which he was subjected.  But in addition to the close temporal

12

proximity, Dr. Alkhawaldeh also has direct evidence of retaliation that came straight from Dow management.

### a. Dow management acknowledge their negative attitude toward Dr. Alkhawaldeh because of his complaints

The uncontroverted evidence establishes that Ganesh Kailasam was upset that Dr. Alkhawaldeh complained about discrimination and retaliation to Kailasam's boss and the CEO of Dow. ROA.1266. Barnes admitted that the fact that Dr. Alkhawaldeh had written complaint letters to Liveris and Banholzer may have been the reason why Kailasam wanted to fire Dr. Alkhawaldeh. ROA.1206-1208. Indeed, the day after Dr. Alkhawaldeh successfully completed his PIP, Kailasam let it be known that he wanted Dr. Alkhawaldeh fired by the end of August because he was still upset that Dr. Alkhawaldeh took his complaints to Bill Banholzer, Kailasam's boss. ROA.1266.

Just two days after "the end of August," Dow had scheduled the ERM. Following the ERM, Dr. Alkhawaldeh was fired on September 28, 2010, less than three months following his complaint to upper management.

### b. Dow's decision makers admit that Dr. Alkhawaldeh was fired because of his complaints

The ERM that was scheduled to "discuss" Dr. Alkhawaldeh was attended by West, Hook, Barnes, Gibson, and Ludovic Valette. Each of the attendees, including Hook, had the opportunity to provide input on the decision to terminate

Dr. Alkhawaldeh. Hook candidly testified that going into the meeting, he believed Dr. Alkhawaldeh should be fired because he had "destroyed whatever relationships that he had as far as being able to successfully have a career at Dow." ROA.944-945.

Additionally, the notes prepared for the meeting make clear that Dr. Alkhawaldeh's complaints of discrimination and retaliation were among the factors considered in deciding whether to terminate Dr. Alkhawaldeh. ROA.1272-1273. The notes reference Dr. Alkhawaldeh's numerous complaints of discrimination and retaliation he had made to individuals throughout the company, including Bill Banholzer, Andrew Liveris, Rick Cassiday, and Lisa Skaggs. ROA.944. The notes even discuss the fact that Dr. Alkhawaldeh had filed a Charge of Discrimination with the EEOC and that he had made complaints to Dow's ethics hotline. ROA.944.

### c. The EEOC rejects Dow's story and finds in Dr. Alkhawaldeh's favor

Following its termination of Dr. Alkhawaldeh, Dow lied to the EEOC, and claimed that Dr. Alkhawaldeh "was terminated based on his poor performance in 2009 and his failure to complete a Performance Improvement Plan." ROA.1300. The EEOC saw right through Dow's story, and issued a determination that Dr.

Alkhawaldeh was terminated "because [he] made internal complaints and filed several EEOC charges" in violation of Title VII.  ROA.1305-1306.

## B.  There are Numerous Questions of Fact Concerning Dow's Articulated Reason for Termination

Dow claims that it terminated Dr. Alkhawaldeh for "poor performance." The evidence belies this assertion.

### 1.  Prior to His Complaints, Dr. Alkhawaldeh was an Excellent Performer

The circumstances underlying this claim are particularly suspicious. Specifically, prior to Dr. Alkhawaldeh complaining of discrimination in November 2009, Dow viewed him as an excellent performer.

#### a.  Dr. Alkhawaldeh Achieves what Others Could Not

Dr. Alkhawaldeh began working for Dow in January 2008.  By everyone's accounts, Dr. Alkhawaldeh's performance was outstanding.  According to Hook, the first project that Dr. Alkhawaldeh led at Dow in 2008 was a huge success. Prior to Dr. Alkhawaldeh's involvement with the project, Dow had made several attempts with the project, but they all failed.  Dr. Alkhawaldeh was able to accomplish on that project what others at Dow had previously been unable to do.

For his efforts, Dr. Alkhawaldeh received praise from several persons at Dow from his work on the project, including Hook and Phil Carlberg.  Hook

considered the project to be very challenging.  Given the previous failures in the project, Hook viewed the project as a show stopper for an employee new to Dow.

### b.     Dow Praised Dr. Alkhawaldeh's Qualification and Work Performance in Support of his I-140 Petition

In the spring of 2008, Dow signed a letter in support of Dr. Alkhawaldeh's I-140 petition.   West then reviewed Hook's letter of support and made some suggestions regarding Dow's praise for Dr. Alkhawaldeh's work.   The letter described Dr. Alkhawaldeh as a "talented outstanding researcher who has brought a unique set of skills, solid scientific background, and an innovative way of thinking that makes him an important member of our highly-talented research team."   It further describes Dr. Alkhawaldeh as having "strong research experience," "impressive skills in leaving and managing research projects," and "a unique ability to approach and solve complex research problems" making him an "important asset" for Dow.

### c.     Dow Supports Dr. Alkhawaldeh's Application for an O-1 Visa Because of his "Extraordinary Abilities"

In February 2009, Dr. Alkhawaldeh received his first performance evaluation, in which he was rated a "3" on a scale of "1" to "5."  Shortly thereafter, given Dr. Alkhawaldeh's successful performance, in March 2009 Dow immigration personnel recommended that Dow apply for an O-1 visa for Dr. Alkhawaldeh, which are visas awarded to aliens of "extraordinary ability" in his or

her field who have demonstrated sustained national or international acclaim and recognition. Dow petitioned for the O-1 visa on the basis that Dr. Alkhawaldeh was one of that small percentage of scientists who had risen to the very top of his field of endeavor.

In support of the O-1 visa, Hook represented that Dr. Alkhawaldeh had a "diverse and strong research experience" and "impressive skills in leading and managing research projects [that] give him a unique ability to… solve complex research problems" and "make him an important asset for the company." In addition, Dow submitted letters from 15 internationally renowned scientists attesting to Dr. Alkhawaldeh's outstanding abilities as a research scientist. The petition for the O-1 visa was submitted in May 2009. When Dr. Alkhawaldeh was approved in June 2009 for the O-1 Visa, Hook was "relieved."

### d.    Dow Applies for Permanent Residency for Dr. Alkhawaldeh

In October 2009, Dow applied for permanent residency for Dr. Alkhawaldeh. Permanent residency was a long-term solution that would allow Dr. Alkhawaldeh to stay in the country and work for Dow. Dow only pursues permanent residency for those employees that Dow believes are going to be long-term contributors to the company. Hook submitted a letter to the government in October 2009 in support of Dow's petition for permanent residency for Dr. Alkhawaldeh. Hook stated that he "strongly support[ed] Dr. Alkhawaldeh's

application for permanent residency in the US, as his research expertise and distinguished record of success are not only in the best interest of Dow but also in that of our country." Hook described Dr. Alkhawaldeh's research efforts at Dow as "distinguished" and "crucial to [the] success" of the project Dr. Alkhawaldeh was working on.

### e. Dow Offers No Credible Explanation for the Sudden Shift of View of Performance after Dr. Alkhawaldeh's complaints

As explained above, just three months after Hook's glowing comments regarding Dr. Alkhawaldeh's performance, Hook sought to have Dr. Alkhawaldeh transferred to a different department. Hook then inexplicably issued Dr. Alkhawaldeh a negative performance evaluation, and placed him on a PIP. Both West and Dizer considered a drop from a "3" segmentation to a "1" in one year to be unusual. West was unaware of any employees within Hook's group, other than Dr. Alkhawaldeh, who dropped from a "3" to a "1" in just one year. Dizer said Dr. Alkhawaldeh's drop from a "3" to a "1" was particularly surprising, considering the letter of support that Hook wrote in October 2009. ROA.1118-1119; ROA.1289-1290.

### f. Hook Never Documented Any Performance Issues Prior to Dr. Alkhawaldeh's Complaints

Furthermore, although Hook and Dr. Alkhawaldeh met almost monthly in 2009, Hook never told Dr. Alkhawaldeh that he was in danger of receiving a "1" or

18

"2" calibration for 2009. ROA.929-930. Nor do Hook's notes of these monthly meetings reflect that Dr. Alkhawaldeh was tracing toward a "1" or "2" segmentation or was in danger of being placed on a PIP. ROA.931-933. In short, prior to receiving his 2009 performance review, Dr. Alkhawaldeh was never told that he was at risk of being placed on a PIP or of any significant decline in his performance. ROA.1150-1155.

Moreover, once Dr. Alkhawaldeh was given his 2009 performance review, and accused of poor performance, he immediately recognized that the poor rating was in retaliation for his complaints. ROA.1150-1155. Dr. Alkhawaldeh promptly complained about the false evaluation, and prepared a detailed and *specific* rebuttal to the allegations, refuting all of the allegations that Hook had made about his performance. ROA.458-466; ROA.468-470; ROA.476-482; ROA.521-529; ROA.1118; ROA.1150-1155.

A jury could reasonably infer from the foregoing evidence that the "1" rating did not truly reflect Dr. Alkhawaldeh's performance during 2009. A jury could further infer that, if Dow based Dr. Alkhawaldeh's 2009 Performance Review on something other than Dr. Alkhawaldeh's true performance, it could have also based its decision to terminate Dr. Alkhawaldeh on something other than his true performance, such as his complaints of discrimination and retaliation. . *See, e.g.,*

*Heinsohn v. Carabin & Shaw, P.C.*, Docket No. 15-50300, at *16-17 (5th Cir. July 28, 2016).

In *Heinsohn v. Carabin & Shaw, P.C.*, the Court found that the Plaintiff offered sufficient evidence of pretext where the employer offered very little contemporaneous documentation supporting the reason for termination, and relied primarily on *post hoc* evidence to support the reason.  *Id.*  That is precisely the situation in this case.  Indeed, in its Brief, Dow cites to the Record at 228-606 to support its claim of poor performance.  However, a review of the record reveals that the vast majority of that documentation consists of either Dow engaging in e-mail correspondence discussing plans to terminate Dr. Alkhawaldeh, or *post hoc* deposition testimony attempting to justify its decision.  Indeed, within the cited portion of the record, there is more documentation of Dr. Alkhawaldeh rebutting the performance allegation, than documentation offered by Dow regarding the alleged poor performance.  ROA.458-466;  ROA.468-470;  ROA.476-482; ROA.521-529.

## 2.  Dr. Alkhawaldeh's completion of the PIP demonstrated satisfactory performance at the time of termination

To the extent that Dow claims Dr. Alkhawaldeh's performance miraculously and coincidentally declined at the exact same time that he began complaining of discrimination in the workplace, it should be clear that, even after he made his

complaints, Dr. Alkhawaldeh was performing at a satisfactory level. In July 2010, Dr. Alkhawaldeh satisfactorily completed his PIP indicating that he was performing his job well just prior to his termination. Given Kailasam's determination to fire Dr. Alkhawaldeh despite the fact that he satisfactorily completed his PIP, a fact issue clearly exists as to whether Dow's explanation for Dr. Alkhawaldeh's termination was pretextual. *See, e.g.,* ROA.1081-1084. Moreover, to the extent that Dow contends that Dr. Alkhawaldeh has no evidence of discriminatory and/or retaliatory animus on the part of Kailasam, this argument likewise fails, since Kailasam was acting at the direction of Hook. ROA.1081-1084. *See Staub v. Proctor Hospital,* 131 S.Ct. 1186 (2011).

Recognizing the significance of Dr. Alkhawaldeh's completion of the PIP, Dow claimed to the EEOC that Dr. Alkhawaldeh "failed to complete a Performance Improvement Plan." That was simply false, as Barnes acknowledged by email, "The PIP has been declared as complete and [Dr. Alkhawaldeh] will now be allowed to perform on his own." Indeed, both West and Kailasam testified that Dr. Alkhawaldeh completed his PIP. Kailasam also acknowledged that, having completed his PIP, Dr. Alkhawaldeh could not have been ***properly fired*** for failing to complete it. Thus, Dow's statement to the EEOC that Dr. Alkhawaldeh was terminated in part because of his PIP further demonstrates Dow's unlawful motive.

Because Dr. Alkhawaldeh established a *prima facie* case of retaliation and provided substantial evidence that Dow's proffered reason for Dr. Alkhawaldeh's termination is false, the District Court's order of summary judgment must be reversed.

## C.     The District Court Improperly Found No Similarly Situated Comparators

With Respect to Dr. Alkhawaldeh's claim for discrimination under Title VII, Dow claims that Dr. Alkhawaldeh has no evidence of similarly situated comparators. Dow argues that Dr. Alkhawaldeh was the only employee at his level and experience who was calibrated a "1" on his 2009 Performance Review, and therefore he cannot point to any other "similarly situated" employees (rated a "1") who were not terminated. Dow also argues that Dr. Alkhawaldeh, therefore, cannot establish that he was treated less favorably than others outside the protected class. In making this argument, Dow simply ignores the substantial evidence that Dr. Alkhawaldeh's performance rating was given because of the discrimination and retaliatory treatment—not as a part of Dow's normal course of business. Thus, contrary to Dow's assertion, the proper comparison is to those Dow employees who are not of Jordanian descent, not Muslim, and who had not opposed discrimination and retaliation in the workplace. When making the proper comparison, the summary judgment evidence establishes at least a fact issue as to

whether Dr. Alkhawaldeh was treated less favorably than other similarly situated employees outside his protected group by being rated a "1", placed on a PIP and ultimately terminated even though he successfully completed the PIP. No other FS/FL was so treated by Dow.

A jury could find on the evidence that Dow rated Dr. Alkhawaldeh a "1" and placed him on a PIP with the intention of firing him in retaliation for his complaints about discrimination and retaliation. Indeed, Kailasam had previously utilized the PIP process to get rid of employees he wished to terminate.

## D.    The Same Actor Inference is Not Applicable

Finally, Dow also asserts that the same actor inference bars Dr. Alkhawaldeh's claims.  Dow is wrong.  It is clear that, within a short period of time, when the same supervisory employee hires and fires a plaintiff, this can give rise to an inference that discrimination was not a determining factor for an adverse employment action taken by an employer. *Brown v. CSC Logic*, 82 F.3d 651, 658 (5th Cir. 1996).   However, this same-actor inference does "not rule out the possibility that an individual could prove a case of discrimination." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 229 n.16 (5th Cir. 2000).   "Although a court may infer an absence of discrimination if the same individual hired and fired the plaintiff, such an inference is not required." *Ibrahim v. City of Houston*, 2009 U.S. Dist. LEXIS 31735, * 70 (S.D. Tex. April 15, 2009).

Here, the same-actor interference should not be applied in this case. First, there is no clear testimony that Hook or West made the decision to hire Dr. Alkhawaldeh. Moreover, the same actor inference is clearly inapplicable to Dr. Alkhawaldeh's claim for retaliation. In order for the same actor inference to apply, Dow would be required to offer evidence that, prior to his hiring, Dr. Alkhawaldeh had complained of discrimination at Dow, and that it hired him anyway. Setting aside the obvious difficultly in ever having that scenario, here it is undisputed that Dr. Alkhawaldeh complained of discrimination for the first time in November 2009, at the earliest, and never complained of discrimination prior to his hiring.

### III. CONCLUSION

For the foregoing reason, the district court's judgment should be reversed, and the matter should be remanded for a trial on the merits.

Respectfully Submitted,

AHMAD, ZAVITSANOS, ANAIPAKOS,
ALAVI &MENSING, P.C.

*/s/ Joseph Y. Ahmad*
Joseph Y. Ahmad
Texas Bar No. 00941100
1221 McKinney St., Suite 2500
Houston, Texas 77010
Telephone: (713) 655-1101
Facsimile: (713) 655-0062
Email: joeahmad@azalaw.com

ATTORNEY FOR PLAINTIFF-
APPELLANT AMMAR ALKHAWALDEH

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on the 1st day of August, 2016, on the following via ECF and/or email.

Michael Lamar Brem
Schirrmeister Diaz-Arrastia Brem LLP
Pennzoil Place – North Tower
700 Milam Street, 10th Floor
Houston, Texas 77002

*Counsel for Defendant-Appellee*

*/s/ Joseph Y. Ahmad*
Joseph Y. Ahmad
Attorney for Appellant

25

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. 32(a)
(7)(B) because:

> this brief contains 4,984 words, excluding the parts of the brief
> exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

2.    This brief complies with the typeface requirements of Fed. R. App. P.
32(a)(6) because:

> this brief has been prepared in a proportionality spaced typeface using
> Microsoft Word 2013 in Times New Roman, 14 pt.


*/s/ Joseph Y. Ahmad*
Joseph Y. Ahmad
Attorney for Appellant