CASE NO. 16-20069

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
_____

AMMAR ALKHAWALDEH
*Plaintiff-Appellant,*
v.
DOW CHEMICAL COMPANY
*Defendant-Appellee.*

_____

On Appeal from the United States District Court
Southern District of Texas
District Court No. 4:14-CV-4022
Honorable Lynn N. Hughes, Presiding
_____

**APPELLANT'S CORRECTED BRIEF**
_____

Joseph Y. Ahmad
Texas Bar No. 00941100
Ahmad, Zavitsanos, Anaipakos
Alavi & Mensing, P.C.
1221 McKinney St., Suite 2500
Houston, Texas 77010
Telephone: (713) 655-1101
Facsimile: (713) 655-0062
Email: joeahmad@azalaw.com

ATTORNEY FOR APPELLANT

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons or entities as described in the fourth sentence of Rule 28.2 1 have an interest in the outcome of this case. These representations are made in order that the Judges of this court may evaluate possible disqualifications or recusal.

*Plaintiff-Appellant:*

Ammar Alkhawaldeh

*Counsel for Plaintiff-Appellant*

Joseph Y. Ahmad
Ahmad, Zavitsanos, Anaipakos,
Alavi & Mensing, P.C.
1221 McKinney St., Suite 2500
Houston, Texas 77010
Telephone: (713) 655-1101
Facsimile:  (713) 655-0062
Email: joeahmad@azalaw.com

*Defendant-Appellee:*

Dow Chemical Company

Michael Lamar Brem
Schirrmeister Diaz-Arrastia Brem LLP
Pennzoil Place – North Tower
700 Milam Street, 10th Floor
Houston, Texas 77002
Email: mbrem@sdablaw.com

*Counsel for Defendant-Appellee*

## **STATEMENT REGARDING ORAL ARGUMENT**

Because of the relatively large amount of evidence in the record and cited in the summary judgment briefing, Appellant believes that oral argument will be particularly helpful in this case, and respectfully requests oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....................................................... ii

STATEMENT REGARDING ORAL ARGUMENT ............................................ iii

TABLE OF CONTENTS ........................................................................................ iv

TABLE OF AUTHORITIES ................................................................................... vi

STATEMENT OF JURISDICTION .........................................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW .....................................1

STATEMENT OF THE CASE .................................................................................1

    A.   Procedural History ........................................................................................1

    B.   Facts .............................................................................................................2

SUMMARY OF THE ARGUMENT .....................................................................38

ARGUMENT ..........................................................................................................38

   I. District Court Ignored Overwhelming Evidence of Retaliation in Granting
      Summary Judgment ......................................................................................38

    A.   Plaintiff showed a prime facie case of retaliation ....................................38

       1.   Plaintiff engaged in protected activity .................................................39

       2.   Plaintiff was subjected to an adverse employment action ...................41

       3.   Plaintiff showed a causal link between his terminated and his
           protected activity ..................................................................................42

          a.   Timing ...........................................................................................42

          b.   Additional evidence ......................................................................43

    B.   In finding no evidence of pretext, Court ignored evidence that Dow's
       proffered reasons for plaintiff's termination was false. ...........................44

  II. District Court resolved disputed evidentiary issues in Dow's favor in granting
      Summary Judgment ......................................................................................53

    A.   Court improperly found that Plaintiff did not show a prima facie case of
       discrimination. .........................................................................................53

    B.   Court improperly applied "same actor inference". ...................................56

    C.   In finding no evidence of pretext, Court ignored evidence that Dow's
       proffered reasons for plaintiff's termination was false. ...........................58

CONCLUSION ...................................................................................................62

CERTIFICATE OF SERVICE ...........................................................................63

CERTIFICATE OF COMPLIANCE....................................................................64

# TABLE OF AUTHORITIES

**Cases**

*Abdulbaki v. Regent Care Center*,
  2012 U.S. Dist. LEXIS 43827, n. 124 (W.D. Tex. March 29, 2010) ..................39

*Brown v. CSC Logic*,
  82 F.3d 651 (5th Cir. 1996) .......................................................................56

*Buehler v. City of Austin/Austin Police Dep't*,
  No. 15-50155, 2016 WL 3085528, (5th Cir. June 1, 2016)....................................1

*Carrera v. Comm. Coating Servs. Int'l, Ltd.*,
  422 F. App'x 334 (5th Cir. 2000) ........................................................39

*Davis v. Fort Bend County*,
  765 F.3d 480 (5th Cir. 2014) .............................................................38

*Ercegovich v. Goodyear Tire & Rubber Co.*,
  154 F.3d 344 (6th Cir. 1998) ..............................................................60

*Evans v. City of Houston*,
  246 F.3d 344 (5th Cir. 2001) ..................................................... 41, 42

*Feist v. Louisiana, Dept. of Justice*,
  730 F.3d 450 (5th Cir. 2013) .............................................................42

*Fierros v. Texas Dept. of Health*,
  274 F.3d 187 (5th Cir. 2001) .............................................................39

*Hall v. Gillman, Inc.*,
  81 F.3d 35 (5th Cir. 1996) ...............................................................44

*Ibrahim v. City of Houston*,
  2009 U.S. Dist. LEXIS 31735 (S.D. Tex. April 15, 2009) ...........................56

*Long v. Eastfield College*,
  88 F.3d 300, 304 (5th Cir. 1996)............................................................39

*McCoy v. City of Shreveport*,
  492 F.3d 551 (5th Cir. 2007) .................................................................53

*Nichols v. Loral Vought Systems Corp.*,
  81 F.3d 38 (5th Cir. 1996) .....................................................................53

*Pegram v. Honeywell, Inc.*,
  361 F.3d 272 (5th Cir. 2004) .................................................................41

*Price*,
  283 F.3d at 275....................................................................................46

*Reeves v. Sanderson Plumbing Products, Inc.*,
  530 U.S. at 148 (2009)…………………………………………………….. 48, 49

*Russell v. McKinney Hosp. Venture*,
  235 F. 3d 219 (5th Cir. 2000) ......................................................... 56, 60

*Santiago- Ramo v. Centennial P.R. Wireless Corp.*,
  217 F. 3d 219 (1st Cir. 2000).................................................................60

*Smith v. Universal Servs., Inc.*,
  454 F.2d 154 (5th Cir. 1972) .................................................................46

*Staten v. New Palace Casino, LLC,*
    187 F. App'x 350 (5th Cir. 2006) ........................................................................44

*Texas Dept. of Community Affairs v. Burdine*,
    450 U.S. 248 (1981) ................................................................................ 44, 53

*Waldron v. SL Indus., Inc.*,
    56 F.3d 491 (3rd Cir. 1995) ..............................................................................57

*Wexler v. White's Fine Furniture, Inc.*,
    317 F.3d 64 (6th Cir. 2003)................................................................................56

*Zamora v. City of Houston*,
    798 F.3d 326 (5th Cir. 2015) .............................................................................38

**Statutes**

Title VII 42 U.S.C. § 2000e-3 (a) .............................................................................38

viii

# I.

## STATEMENT OF JURISDICTION

A district court's ruling on a motion for summary judgment is reviewed de novo on appeal. *Buehler v. City of Austin/Austin Police Dep't*, No. 15-50155, 2016 WL 3085528, * 3 (5th Cir. June 1, 2016).

# II.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. **Whether the district court erred in ignoring overwhelming evidence of retaliatory intent in granting summary judgment?**

2. **Whether the district court resolved disputed issues of fact in finding no pretext to support Plaintiff's retaliation claim?**

3. **Whether the district court ignored evidence of discriminatory intent in granting summary judgment?**

4. **Whether the district court correctly applied the "same actor inference" in granting the summary judgment on Plaintiff's discrimination claim?**

# III.

## STATEMENT OF THE CASE

A. <u>Procedural History</u>

Appellant, Ammar Alkhawaldeh, brought suit against Appellee, Dow Chemical Company, in the United States District Court for the Southern District of Texas, Houston Division on November 17, 2011 violation of Title VII of the Civil Rights Act of 1964. On September 4, 2013, Appellee filed a Motion for Summary Judgment requesting dismissal of all of Appellant's claims. On October 04, 2013,

Appellant filed his response to Appellee's Motion for Summary Judgment requesting the court to deny Appellee's motion in its entirety. On October 17, 2013, Appellee filed a Reply in Support of its Motion for Summary Judgment. On December 31, 2015, Judge Lynn N. Hughes issued an opinion and order granting the Summary Judgment in its entirety. Plaintiff-Appellant now appeals.

B. <u>Facts</u>

Dr. Alkhawaldeh holds a PhD from Texas A&M University in Chemical Engineering.[1] He has lived in the United States since 1996.[2] Dr. Alkhawaldeh obtained an O-1 visa for people with extraordinary abilities in science while working at Dow and re-qualified for the O-1 visa when he went to work for Texas A&M after Dow fired him.[3] Dr. Alkhawaldeh worked in Dow's Epoxy R&D group.[4] He was a Functional Scientist/ Functional Leader ("FS/FL").[5] He began working for Dow in January 2008.[6] Dr. Bruce Hook, a white American, was Dr. Alkhawaldeh's supervisor at Dow for all but the last few months of Dr. Alkhawaldeh's employment.[7] Hook was the technical leader of the epoxy group responsible for

---

[1] Ex. A (Alkhawaldeh Depo.) 218:9-12, ROA.738.
[2] Ex. A (Alkhawaldeh Depo.) 94:7-14, ROA.697.
[3] Ex. A (Alkhawaldeh Depo.) 13:5-17, ROA.664. 18:15-21, ROA.667. 71:19-25, ROA.694. 96:5-20, ROA.698.
[4] Ex. A (Alkhawaldeh Depo.) 20:7-8, ROA.669.
[5] Ex. A (Alkhawaldeh Depo.) 25:1-7, ROA.674.
[6] Ex. B (Hook Depo.) 18:14-25, ROA.869.
[7] Ex. A (Alkhawaldeh Depo.) 16:8-10, ROA.665. Ex. B (Hook Depo.) 13:17-21, ROA.865. 16:14-17, ROA.868. Ex. C (West Depo.) 15:25-16:2, ROA.1015-1016. Ex. D (Kailasam Depo.) 12:25-13:2, ROA.1062-1063.

managing the personnel within that group.[8] Phil Carlberg, a white American, was Hook's scientist partner.[9] Following Dr. Alkhawaldeh's termination, Hook was asked to take a position with purely technical responsibility and no direct supervisory responsibility.[10]

David West, a white American and Hook's boss[11] was Dr. Alkhawaldeh's supervisor for the last few months of his employment.[12] West is not a PhD; he holds a bachelor's degree in chemistry.[13] West and Hook both knew that Dr. Alkhawaldeh was a Jordanian citizen.[14] Hook was also aware that Dr. Alkhawaldeh is a Muslim.[15]

Ganesh Kailasam, a native of India, was West's boss[16] and the top executive in Dow's R&D group.[17] As discussed in more detail below, Kailasam wanted to fire Dr. Alkhawaldeh shortly after learning of Dr. Alkhawaldeh's complaint about Hook and others. Kailasam became upset and reiterated his desire that Dr. Alkhawaldeh be fired when Dr. Alkhawaldeh complained about discrimination and retaliation to Kailasam's boss, Bill Banholzer, and Dow's CEO, Andrew Liveris; and he told Dow

---

[8] Ex. A (Alkhawaldeh Depo.) 58:18-21, ROA.690. Ex. B (Hook Depo.) 8:4-15, ROA.861.

[9] Ex. A (Alkhawaldeh Depo.) 58:18-21, ROA.690.

[10] Ex. B (Hook Depo.) 9:18-11:6, ROA.862-864. Ex. C (West Depo.) 54:15-18, ROA.1021. Ex. D (Kailasam Depo.) 20:1-21:13, ROA.1066-1067.

[11] Ex. B (Hook Depo.) 9:4-5, ROA.862. Ex. C (West Depo.) 15:19-21, ROA.1015. Ex. D (Kailasam Depo.) 12:23-24, ROA.1062.

[12] Ex. A (Alkhawaldeh Depo.) 16:8-13, ROA.665.

[13] Ex. C (West Depo.) 13:2-9, ROA.1013.

[14] Ex. A (Alkhawaldeh Depo.) 16:17-17:6, ROA.665-666. Ex. B (Hook Depo.) 13:22-14:7, ROA.865-866. Ex. C (West Depo.) 21:11-17, ROA.1018. 22:1-2, ROA.1019.

[15] Ex. B (Hook Depo.) 15:18-16:1, ROA.867-868.

[16] Ex. C (West Depo.) 16:5-7, ROA.1016. Ex. D (Kailasam Depo.) 12:21-22, ROA.1062.

[17] Ex. D (Kailasam Depo.) 13:6-14:1, ROA.1063-1064.

HR he wanted Dr. Alkhawaldeh fired the day after Dr. Alkhawaldeh satisfactorily completed his PIP. Kailasam had previously proposed using Dow's PIP process to "exit" another employee.

According to Hook, the first project that Dr. Alkhawaldeh led at Dow in 2008 was a huge success. Dr. Alkhawaldeh was able to accomplish what others at Dow had not been able to do.[18] The project involved a team-leading role and a technical role.[19] No technical work had been done on the project, and Dr. Alkhawaldeh had to start from scratch on the technical aspects of the project.[20] Before Dr. Alkhawaldeh's involvement with the project, Dow had made several attempts at the project, but they all failed.[21] Dr. Alkhawaldeh received praise from several persons at Dow from his work on the project, including Hook and Phil Carlberg.[22] Hook was also pleased with Dr. Alkhawaldeh's work.[23] Hook considered the project to be very challenging.[24] It was one at which other people and which, according to Hook, could have been a show stopper for an employee new to Dow.[25]

---

[18] Ex. B (Hook Depo.) 19:1-21:10, ROA.870-872.
[19] Ex. A (Alkhawaldeh Depo.) 63:14-19, ROA.691.
[20] Ex. A (Alkhawaldeh Depo.) 64:12-16, ROA.692.
[21] Ex. A (Alkhawaldeh Depo.) 64:10-11, ROA.692.
[22] Ex. B (Hook Depo.) 21:11-16, ROA.872. 23:23-24:20, ROA.873-874.
[23] Ex. B (Hook Depo.) 21:11-16, ROA.872. 23:23-24:20, ROA.873-874.
[24] Ex. B (Hook Depo.) 48:24-49:7, ROA.885-886.
[25] Ex. B (Hook Depo.) 48:11-14, ROA.885.

In October 2008, Dr. Alkhawaldeh passed the examination required to receive his Six Sigma Green Belt Project Leader certification,[26] completing the certification process in ten months[27] instead of the two years that Dow expected it to take.[28]

In March 2008, Dow began the process of seeking permanent residency for Dr. Alkhawaldeh based upon his status as an outstanding researcher.[29] Hook submitted a letter to the United States government in support of Dr. Alkhawaldeh's I-140 outstanding researcher petition.[30] Dr. Alkhawaldeh drafted the letter on Hook's instructions after discussing the contents within him.[31] Hook revised the draft[32] and signed it, adopting for himself all of the statements set forth therein.[33] Hook understood that it was important that the content of the letter be truthful and accurate, because it was being submitted to the government in support of Dr. Alkhawaldeh's I-140 petition.[34] He meant everything he said about Dr. Alkhawaldeh in the letter.[35]

---

[26] Ex. A (Alkhawaldeh Depo.) 57:22-58:4, ROA.689-690. Ex. 17, ROA.841-842.

[27] Ex. B (Hook Depo.)  59:22-25, ROA.887.

[28] Ex. A (Alkhawaldeh Depo.) 71:8-21, ROA.694. 75:11-17, ROA.695. Ex. 1, ROA.744-746.

[29] Ex. B (Hook Depo.) 59:9-15, ROA.887.

[30] Ex. B (Hook Depo.) 62:5-63:6, ROA.888-889. 64:20-25, ROA.890. Ex. 2, ROA.948-949.

[31] Ex. A (Alkhawaldeh Depo.) 39:5-40:2, ROA.680-681. 40:19-41:2, ROA.681-682. 41:7-17, ROA.682. 42:8-18, ROA.683. Ex. B (Hook Depo.) 65:1-8, ROA.891.

[32] Ex. A (Alkhawaldeh Depo.) 43:11-13, ROA.684. 43:21-44:6, ROA.684-685.

[33] Ex. B (Hook Depo.) 66:23-67:9, ROA.892-893.

[34] Ex. B (Hook Depo.) 67:10-25, ROA.893.

[35] Ex. B (Hook Depo.) 67:7-9, ROA.893.

West reviewed Hook's letter of support and made some suggestions,[36] including the following recommendation:

> While it is good to say [Dr. Alkhawaldeh] is doing a nice job on projects at Dow it is better to make a case for him having a distinguished record of published research. We need to make the case that he is much better qualified than other candidates.[37]

On May 18, 2008, Dow submitted Hook's letter in support of Dr. Alkhawaldeh's I-140 Outstanding Researcher petition.[38] The letter describes Dr. Alkhawaldeh as a "talented outstanding researcher who has brought a unique set of skills, solid scientific background, and an innovative way of thinking that makes him an important member of our highly-talented research team."[39] It further states,

> Dr. Alkhawaldeh's diverse and strong research experience in the area of reaction engineering, reactive ion etching, and nanotechnology, in addition to his impressive skills sin leaving and managing research projects, gives [sic] him a unique ability to approach and solve complex research problems and makes him an important asset for our company… Dr. Alkhawaldeh is an outstanding and experienced researcher and I am glad that he joined our team. I highly recommend him for this immigrant petition as our country is in crucial need of outstanding researchers with his experience and knowledge.[40]

Around October 2008, Hook interrupted a meeting between Dr. Alkhawaldeh and two co-workers, and in an intimidating and aggressive manner complained to

---

[36] Ex. A (Alkhawaldeh Depo.) 44:10-45:1, ROA.685-686.
[37] Ex. A (Alkhawaldeh Depo.) 44:10-45:1, ROA.685-686.
[38] Ex. A (Alkhawaldeh Depo.) Ex. 5, ROA.747-748.
[39] Ex. A (Alkhawaldeh Depo.) Ex. 9, ROA.948-949.
[40] Ex. A (Alkhawaldeh Depo.) Ex. 9, ROA.948-949.

Dr. Alkhawaldeh in a loud voice that a document was missing from the project Management of Change ("MOC") folder.[41] In fact, the document was not missing. When Dr. Alkhawaldeh later told Hook in one-on-one meeting that he had been offended by Hook's actions, Hook responded, "It seems that people from your part of the world do not get it. It's different here and you need to live with it."[42]

In February 2009, Dr. Alkhawaldeh received a "3" rating on his 2008 Performance Review[43] on a scale of "1" to "5", with "1" being the lowest possible rating.[44] In March 2009, Dow immigration personnel recommended that Dow apply for an O-1 visa for Dr. Alkhawaldeh.[45] In May 2009, Dow petitioned for the O-1 visa on the basis that Dr. Alkhawaldeh met the statutory and regulatory requirements for an alien with extraordinary ability in science.[46] O-1 visas are awarded to aliens of extraordinary ability in the fields of science, education, business, and athletics who have demonstrated sustained national or international acclaim and recognition.[47] Dow petitioned for the O-1 visa on the basis that Dr. Alkhawaldeh was one of that small percentage of scientist who had risen to the very top of his

---

[41] Ex. A (Alkhawaldeh Depo.) 21:14-22:4, ROA.670-671.
[42] Ex. A (Alkhawaldeh Depo.) 22:8-24, ROA.671. Ex. B (Hook Depo.) 78:16-79:5, ROA.894-895.
[43] Ex. A (Alkhawaldeh Depo.) 65:5-17, ROA.693. Ex. E (Barnes Depo.) 81:2-7, ROA.1188.
[44] Ex. B (Hook Depo.) 26:10-20, ROA.875.
[45] Ex. A (Alkhawaldeh Depo.) 71:14-22, ROA.694. Ex. 24, ROA.1312-1313.
[46] Ex. B (Hook Depo.) 154:18-155:1, ROA.907-908. Exhibit C (West Depo.) 71:6-9, ROA.1024. Ex. B (Hook Depo.) Ex. 5, ROA.950-980.
[47] Ex. B (Hook Depo.) 153:21-154:3, ROA.906-907. Ex. B (Hook Depo.) Ex. 5, ROA.950-980.

field of endeavor.[48] In support of the O-1 visa, Hook represented that Dr. Alkhawaldeh had a "diverse and strong research experience" and "impressive skills in leading and managing research projects [that] gave him a unique ability to… solve complex research problems" and "make him an important asset for the company."[49] In addition, Dow submitted letters from 15 internationally renowned scientist attesting to Dr. Alkhawaldeh's outstanding abilities as a research scientist.[50]

The petition for the O-1 visa was submitted in May 2009, in the middle of 2009 Performance Review period.[51] At no time during Dr. Alkhawaldeh's employment with Dow did Dow withdraw the O-1 petition or advise the government that Dr. Alkhawaldeh was not an extraordinary researcher or that he lacked basic chemistry skills.[52] Dow even considered possible assignments outside the United States for Dr. Alkhawaldeh in the event his H-1B visa expired before he got approved for the O-1 visa.[53] The additional cost of these assignments to Dow would have ranged from $172,000 to $255,000.[54]

---

[48] Ex. B (Hook Depo.) 155:2-16, ROA.908. Ex. 5, ROA.950-980.
[49] Ex. B (Hook Depo.) 156:9-23, ROA.909.
[50] Ex. B (Hook Depo.) Ex. 5, ROA.950-980.
[51] Ex. C (West Depo.) 72:2-8, ROA.1025.
[52] Ex. B (Hook Depo.) 166:16-168:15, ROA.911-913. 170:21-171:4, ROA.914-915.
[53] Ex. B (Hook Depo.) 172:7-23, ROA.916. Ex. 7, ROA.981-987.
[54] Ex. B (Hook Depo.) 172:7-23, ROA.916. Ex. 7, ROA.981-987.

Dr. Alkhawaldeh was approved in June 2009 for the O-1 visa.[55] Hook was relieved that Dr. Alkhawaldeh got his O-1 visa and believed that the O-1 visa was a win-win for Dow and Dr. Alkhawaldeh.[56]

In October 2009, Dow applied for permanent residency for Dr. Alkhawaldeh.[57] It was not required to do so.[58] Dow pursues permanent residency for employees that it believes are going to contribute to the company.[59] Permanent residency was a long-term solution that would allow Dr. Alkhawaldeh to stay in the country and work for Dow.[60]

Hook submitted a letter to the government in October 2009 in support of Dow's petition for permanent residency for Dr. Alkhawaldeh.[61] Hook reviewed a draft of the letter prepared for him and adopted all of the statements therein as his own.[62] In the letter, Hook stated that he "strongly support[ed] Dr. Alkhawaldeh's application for permanent residency in the U.S. as his research expertise and distinguished record of success are not only in the best interest of Dow but also in

---

[55] Ex. B (Hook Depo.) 172:25-173:9, ROA.916-917.
[56] Ex. B (Hook Depo.) 173:5-175:23, ROA.917-919. Ex. 8, ROA.988-989. Ex. 9, ROA.990-991.
[57] Ex. B (Hook Depo.) 177:2-10, ROA.920. Ex. 10, ROA.992.
[58] Ex. B (Hook Depo.) 180:5-181:2, ROA.921-922.
[59] Ex. B (Hook Depo.) 180:5-19, ROA.921.
[60] Ex. B (Hook Depo.) 181:7-10, ROA.922.
[61] Ex. B (Hook Depo.) Ex. 10, ROA.992.
[62] Ex. B (Hook Depo.) 186:6-20, ROA.923.

9

that of our country."[63] Hook described Dr. Alkhawaldeh's research efforts at Dow as "distinguished" and "crucial to [the] success" of the project he was working on.[64]

October 2009, when Hook's letter was submitted, was near the end of 2009 Performance Review period for which Dr. Alkhawaldeh received the lowest rating possible.

In November 2009, Dr. Alkhawaldeh attended Six Sigma training.[65] During the training, Dr. Alkhawaldeh complained about two incidents of discriminatory conduct involving two different instructors, Phil Rudolf and Steve Passmore. Rudolf and Passmore both knew that Dr. Alkhawaldeh was an Arab from Jordan.[66]

The incident with Phil Rudolf involved comments made by him in awarding a briefcase to Dr. Alkhawaldeh that he won in a drawing. While handling the briefcase to Dr. Alkhawaldeh, Rudolf said, "You can put a million dollars in it, or 10 kilograms of cocaine, or an assault rifle."[67] Dr. Alkhawaldeh felt that, under the circumstances, Rudolf had singled him out because he was an Arab from Jordan.[68]

In the incident with Steve Passmore, Passmore chastised Dr. Alkhawaldeh for missing class time because he got his own lunch rather than eat what was served at the training because Dow failed to accommodate Dr. Alkhawaldeh's religious

---

[63] Ex. B (Hook Depo.) 187:19-187:24, ROA.924. Ex.10, ROA.992.
[64] Ex. B (Hook Depo.) Ex. 10, ROA.992.
[65] Ex. A (Alkhawaldeh Depo.) 19:7-20:19, ROA.668-669.
[66] Ex. A (Alkhawaldeh Depo.) 119:14-22, ROA.704.
[67] Ex. A (Alkhawaldeh Depo.) 120:1-25, ROA.705. Ex. 65, ROA.762.
[68] Ex. A (Alkhawaldeh Depo.) 119:10-13, ROA.704.

dietary restrictions.[69] As a Muslim, Dr. Alkhawaldeh does not eat pork.[70] Lunch was served during the training, but because the food appeared to be pork (or touching pork) and Dr. Alkhawaldeh could not find anyone to ask whether the lunch was pork, he left to get lunch on his own.[71] When Dr. Alkhawaldeh explained to Passmore that he was late returning from lunch because Dow did not accommodate his religious dietary restrictions, Passmore said that was not his problem.[72] When Dr. Alkhawaldeh discussed the incident with Phil Rudolf, Rudolf told Dr. Alkhawaldeh to pack his lunch in a cooler.[73]

A couple of days after these incidents, Dr. Alkhawaldeh asked to speak to Hook.[74] He complained to Hook about Rudolf's briefcase comment.[75] Hook told Dr. Alkhawaldeh, "When you come from the part of world where you come from, there is a perception, and the perception is reality and you have to accept that."[76] When Dr. Alkhawaldeh responded that he felt Rudolf was discriminatory and not right, Hook threw some papers at him and told him to leave his office.[77]

---

[69] Ex. A (Alkhawaldeh Depo.) 116:13-23, ROA.701. 117:4-10, ROA.702. 118:6-119:7, ROA.703-704.
[70] Ex. A (Alkhawaldeh Depo.) 116:13-17, ROA.701.
[71] Ex. A (Alkhawaldeh Depo.) 117:4-12, ROA.702.
[72] Ex. A (Alkhawaldeh Depo.) Ex. 63, ROA.760-761.
[73] Ex. A (Alkhawaldeh Depo.) Ex. 63, ROA.760-761.
[74] Ex. A (Alkhawaldeh Depo.) 126:19-127:16, ROA.709-710.
[75] Ex. A (Alkhawaldeh Depo.) 127:9-16, ROA.710.
[76] Ex. A (Alkhawaldeh Depo.) 20:9-22, ROA.669.
[77] Ex. A (Alkhawaldeh Depo.) 127:17-128:3, ROA.710-711.

Dr. Alkhawaldeh filed a complaint about Passmore's conduct with Dow's Director of Ethics & Compliance, David Wilkins.[78] Dr. Alkhawaldeh did not complain to Wilkins about Rudolf's briefcase comments because Hook had gotten angry and upset with him when he had told Hook about the incident, and Hook told Dr. Alkhawaldeh that he had overreacted to the situation and that he should not talk about it.[79] Hook testified that his response to Dr. Alkhawaldeh's complaint about Rudolf's comments was to "coach" Dr. Alkhawaldeh not to let his perceptions form his experiences color what were innocuous remarks.[80] Hook's investigation of the incident consisted of asking an employee of Chinese nationality whether he found Rudolf's remark to be offensive.[81] The employee said that he did not.[82] Based on his response, Hook concluded that Dr. Alkhawaldeh had taken the comment out of context and was being overly sensitive.[83] Hook testified he did not understand how Rudolf's remark could be offensive to someone from the Middle East than from another part of the world.[84]

Following this encounter with Hook, Hook's attitude toward Dr. Alkhawaldeh changed. In the last quarter of 2009, Hook told Alkhawaldeh during a conversation

---

[78] Ex. (Alkhawaldeh Depo.) 122:12-123:17, ROA.707-708. Ex. 63, ROA.760-761. Ex. 65, ROA.762.
[79] Ex. A (Alkhawaldeh Depo.) 123:12-23, ROA.708.
[80] Ex. B (Hook Depo.) 90:8-25, ROA.896.
[81] Ex. B (Hook Depo.) 90:8-25, ROA.896. 92:19-25, ROA.897.
[82] Ex. B (Hook Depo.) 92:20-23, ROA.897.
[83] Ex. B (Hook Depo.) 93:12-94:6, ROA.898-899.
[84] Ex. B (Hook Depo.) 98:11-15, ROA.900.

in Hook's car, "People from your part of the world tend not to think analytically. Maybe that's cultural, but it's different. Here you need to think."[85] In another meeting, after Dr. Alkhawaldeh told Hook he was under a lot of stress because of his busy work schedule, Hook told Dr. Alkhawaldeh, "I don't know what your religion does for you, but I'm a devout Christian, and this gives me a lot of comfort; prayers and going to church give me peace and tranquility."[86]

On January 22 and 23, 2010 Hook forwarded two internal Dow job postings in other departments to Dr. Alkhawaldeh.[87] Dr. Alkhawaldeh was surprised and had no idea why Hook did this.[88] A few days later, on January 28, 2010, Phil Carlberg took Dr. Alkhawaldeh to lunch, told him that he spoken with Hook, and that Hook thought Dr. Alkhawaldeh should leave Dow and look for another job.[89] Hook admitted that he was aware that Carlberg encouraged Dr. Alkhawaldeh to be open to job opportunities that might come along.[90] Hook also admitted that he knew Carlberg had lunch with Dr. Alkhawaldeh and this topic had come up.[91] When asked about the lunch with Dr. Alkhawaldeh, Carlberg told Sharon Barnes, a Dow HR

---

[85] Ex. A (Alkhawaldeh Depo.) 23:3-24:3, ROA.672-673.
[86] Ex. B (Hook Depo.) 129:15-23, ROA.901.
[87] Ex. A (Alkhawaldeh Depo.) 134:17-135:1, ROA.712-713. Ex. 70, ROA.763-766. Ex. 71, ROA.767-770.
[88] Ex. A (Alkhawaldeh Depo.) 135:2-3, ROA.713.
[89] Ex. A (Alkhawaldeh Depo.) 139:5-140:16, ROA.714-715.
[90] Ex. B (Hook Depo.) 140:16-21, ROA.904.
[91] Ex. B (Hook Depo.) 140:22-141:2, ROA.904-905.

13

representative that it seemed that, if Dr. Alkhawaldeh was unhappy at Dow, he ought to leave.[92]

The 2009 Performance Review period ran from approximately October or November of 2008 to October or November of 2009.[93] Dr. Alkhawaldeh met with Hook in early February 2010, to receive his 2009 Performance Review.[94] Hook rated Dr. Alkhawaldeh a "1", the lowest possible rating.[95] The performance rating is also referred to within Dow as "segmentation" or "calibration".[96] Dr. Alkhawaldeh was the only employee in Epoxy R&D to receive a "1" segmentation in 2009[97] and is the only employee that Hook has rated a "1" since he began working at Dow in 1989.[98] Dr. Alkhawaldeh is also the only employee that Hook ever placed on a Performance Improvement Plan.[99] During Dr. Alkhawaldeh employment at Dow, there were no other FS/FLs terminated in the epoxy R&D group, and none who were put on a PIP.[100]

---

[92] Ex. E (Barnes Depo.) 128:18-129:9, ROA.1192-1193.
[93] Ex. E (Barnes Depo.) 79:2-5, ROA.1187.
[94] Ex. E (Barnes Depo) 79:6-12, ROA.1187.
[95] Ex. A (Alkhawaldeh Depo.) Ex. 75, ROA.771-778. Ex. F (Dizer Depo.) 34:21-35:9, ROA.1277-1278.
[96] Ex. F (Dizer Depo.) 34:21-35:9, ROA.1277-1278.
[97] Ex. B (Hook Depo.) 234:18-23, ROA.934. West, Hoss boss, testified that Hook did not rank Dr. Alkhawaldeh a "1" during calibration process but could not remember what rank he claims Hook gave Dr. Alkhawaldeh. Ex. C (West Depo.) 128:11-13, ROA.1032. This is just one of the many inconsistencies in the testimony of the Dow employees involved in Dr. Alkhawaldeh's termination.
[98] Ex. B (Hook Depo.) 7:24-8:3, ROA.860-861. 242:2-9, ROA.935.
[99] Ex. B (Hook Depo.) 242:10-25, ROA.935.
[100] Ex. A (Alkhawaldeh Depo.) 25:8-18, ROA.674. 25:24-26:1, ROA.674-675.

David West, Hook's boss, and Mike Dizer, the HR investigator involved in investigating some of Dr. Alkhawaldeh's complaints,[101] both testified that it is unusual for an employee to drop from a "3" segmentation to a "1" in just one year.[102] West was unware of any employees within Hook's group, other than Dr. Alkhawaldeh, who dropped from a "3" to a "1" in just one year.[103] Dizer opined that a drop from a "3" to a "1" was surprising, especially considering the letter of support that Hook wrote in October 2009.[104]

West testified that he would place Dr. Alkhawaldeh in the bottom quarter of chemical engineers that were in West's group.[105] West's opinion of Dr. Alkhawaldeh's abilities is inconsistent with a "1" rating. Under Dow's calibration process, roughly fifteen percent of employees were expected to be rated a "5"; twenty-five percent a "4", a forty percent a "3", fifteen percent a "2", and five percent a "1".[106] A "1" calibration placed Dr. Alkhawaldeh in the lowest give percent of employees. The lowest quarter of employees would include employees with ratings a "3,"2", and "1".

---

[101] Ex. A (Alkhawaldeh Depo.) 25:8-18, ROA.674. 25:24-26:1, ROA.674-675.
[102] Ex. A (Alkhawaldeh Depo.) 25:8-18, ROA.674. 25:24-26:1, ROA.674-675.
[103] Ex. A (Alkhawaldeh Depo.) 25:8-18, ROA.674. 25:24-26:1, ROA.674-675.
[104] Ex. F (Dizer Depo.) 149:8-150:10, ROA.1289-1290. Ex. D (Kailasam Depo.) 36:6-39:10, ROA.1070-1073. Ex. 18, ROA.1118-1129.
[105] Ex. C (West Depo.) 24:12-19, ROA.1020.
[106] Ex. A (Alkhawaldeh Depo.) 141:12-41, ROA.716.

Dr. Alkhawaldeh did not agree with his 2009 Performance Review.[107] Hook conceded that, although he met with Dr. Alkhawaldeh almost monthly the entire time that Dr. Alkhawaldeh worked under Hook's supervision, Hook never told Dr. Alkhawaldeh that he might be calibrated a "1" for 2009.[108] Although Hook testified that it had become obvious by August or September of 2009 that Dr. Alkhawaldeh was at risk of being calibrated a "1" or a "2", he did not inform Dr. Alkhawaldeh of that fact.[109] Although Hook took notes of his monthly meetings with Dr. Alkhawaldeh that reflect items that Hook felt were important at the time, these notes do not reflect that Dr. Alkhawaldeh was in danger of being calibrated a "1" or "2" in 2009 or that he was in danger of being placed on a PIP.[110] Prior to the performance review meeting, Dr. Alkhawaldeh was never told that he was at risk of being placed on a PIP.[111]

On February 8, 2010, Dr. Alkhawaldeh complained about his 2009 Performance Review to Ganesh Kailasam, West's boss and head of the entire R&D division at Dow.[112] On February 12, 2010, Dr. Alkhawaldeh lodged a formal complaint against Hook with Bill Lewis, David Wilkins, Marianne Besaw, and

---

[107] Ex. B (Hook Depo.) 194:23-195:19, ROA.927-928.
[108] Ex. B (Hook Depo.) 197:20-198:11, ROA.929-930.
[109] Ex. B (Hook Depo.) Ex. 11, ROA.993-1000.
[110] Ex. B (Hook Depo.) 229:14-231:9, ROA.931-933.
[111] Ex. D (Kailasam Depo.) Ex. 30, ROA.1150-1158.
[112] Ex. D (Kailasam Depo.) 90:24-25, ROA.1084.

16

Sharon Banes.[113] Bill Lewis was the HR Manager for the Freeport site,[114] Marianne Besaw was a member of Dow's Ethics and Compliance Group,[115] David Wilkins was the Director of Dow's Ethics and Compliance Group,[116] and Barnes was the HR representative for Kailasam's entire R&D group and the first point of contact for Epoxy R&D for complaints like Dr. Alkhawaldeh's.[117] Dr. Alkhawaldeh complained to Lewis, Besaw, Wilkins, and Barnes that Hook was intimidating and aggressive towards him in a meeting that day and that Hook had created a hostile work environment and had been insulting him for months.[118] Dr. Alkhawaldeh had previously complained to Phil Carlberg that Hook was intimidating and aggressive towards him.[119]

Dr. Alkhawaldeh arranged a meeting with Kailasam, West, and Barnes to discuss his complaints about his 2009 Performance Review.[120] That meeting occurred on February 22, 2010.[121] Prior to the meeting, Barnes emailed Kailasam and West, "You and [West] can meet to discuss with [Dr. Alkhawaldeh]… but plead

---

[113] Ex. D (Kailasam Depo.) Ex. 21, ROA.1139-1146. Ex. E (Barnes Depo.) 182:12-17, ROA.1203.
[114] Ex. D (Kailasam Depo.) Ex. 21, ROA.1139-1146.
[115] Ex. E (Barnes Depo.) 185:7-11, ROA.1204.
[116] Ex. D (Kailasam Depo.) 90:14-17, ROA.1084.
[117] Ex. D (Kailasam Depo.) 88:22-89:16, ROA.1082-1083.
[118] Ex. D (Kailasam Depo.) 102:12-15, ROA.1087.
[119] Ex. A (Alkhawaldeh Depo.) 159:13-19, ROA.722. Ex. 91, ROA.796-797. Ex. C (West Depo.) 115:10-117:6, ROA.1028-1030. 119:12-15, ROA.1031.
[120] Ex. D (Kailasam Depo.) 103:1-105:2, ROA.1088-1090.
[121] Ex. C (West Depo.) 105:7-10, ROA.1027. Ex. E (Barnes Depo.) 104:9-105:7, ROA.1189-1190.

remind him that the final outcome on segmentation is all based on upon relative performance. Just listening to him actually change nothing but allows Ammar to feel as though his side of the story was told and heard".[122]

Before the meeting, Barnes told her boss, Jim Bailey,[123] that Kailasam was ready to terminate Dr. Alkhawaldeh, but she was coaching him to follow the process.[124] Bailey responded, "[Kailasam] probably needs to know that moving to a termination decision quickly is not likely because we need to follow-up on employees [sic] complaint…and then any quick termination in the absence of a PIP will be viewed as retaliation."[125] Barnes may have told Kailasam that moving to a quick termination in the absence of a PIP would likely be viewed as retaliation.[126] Kailasam also told West that he wanted to fire Dr. Alkhawaldeh.[127]

Dr. Alkhawaldeh was not fired in February 2010 because Barnes convinced Kailasam to put Dr. Alkhawaldeh on a PIP.[128] Kailasam understood that terminating Dr. Alkhawaldeh without following the PIP process could be viewed as

---

[122] Ex. D (Kailasam Depo.) Ex. 22, ROA.1147-1148.
[123] Ex. D (Kailasam Depo.) 109:11-19, ROA.1091. 110:15-20, ROA.1092. 111:18-113:1, ROA.1093-1095.
[124] Ex. C (West Depo.) 129:21-25, ROA.1033. 134:21-25, ROA.1034. Ex. E (Barnes Depo.) 145:5-25, ROA.1194.
[125] Ex. C (West Depo.) 136:20-137:10, ROA.1035-1036. 137:16-25, ROA.1036. 138:6-21, ROA.1037.
[126] Ex. B (Hook Depo.) 272:5-17, ROA.938.
[127] Ex. A (Alkhawaldeh Depo.) Ex. 86, ROA.795.
[128] Ex. E (Barnes Depo.) Ex. 11, ROA.1238-1239.

retaliation.[129] In the meeting with Kailasam, West, and Barnes on February 22, 2010, Dr. Alkhawaldeh was told that the 2009 Performance Review would not be changed and that Dr. Alkhawaldeh was going to have to go on a PIP.[130] Kailasam told Dr. Alkhawaldeh that they were going to stick with the calibration process.[131] Dow never investigated the accuracy of Dr. Alkhawaldeh's 2009 Performance Review or whether he was subjected to discrimination in the review process.[132]

Dr. Alkhawaldeh complained that he did not want Hook evaluating his proves on the PIP in light of his complaint.[133] Although Kailasam understood why Dr. Alkhawaldeh would feel it was unfair for Hook to evaluate his PIP given Dr. Alkhawaldeh's complaint against Hook, he was not concerned that Hook would be evaluating Dr. Alkhawaldeh's PIP, even if Hook had committed the acts about which Dr. Alkhawaldeh complained, because he felt that West and Barnes were objective.[134] However, neither Barnes nor West was involved in evaluating Dr. Alkhawaldeh's performance on the PIP. Hook was the only person who evaluated Dr. Alkhawaldeh's PIP performance.[135] According to West, Dow could have had someone other than Hook evaluate Dr. Alkhawaldeh's performance on his PIP in

---

[129] Ex. E (Barnes Depo.) Ex. 11, ROA.1238-1239.
[130] Ex. A (Alkhawaldeh Depo.) 168:23-170:6, ROA.723-725. Ex. 102, ROA.798-800.
[131] Ex. E (Barnes Depo.) 226:22-227:15, ROA.1218-1219.
[132] Ex. E (Barnes Depo.) 166:21-167:23, ROA.1197-1998.
[133] Ex. E (Barnes Depo.) 169:1-16, ROA.1200. 170:9-11, ROA.1201.
[134] Ex. E (Barnes Depo.) 166:21-167:23, ROA.1197-1198.
[135] Ex. E (Barnes Depo.) 167:24-168:7, ROA.1198-1199.

19

light of Dr. Alkhawaldeh's complaints of discrimination and hostile work environment against Hook, but that was not even considered.[136]

After February 3, 2010, Hook knew that Dr. Alkhawaldeh objected to being placed on a PIP because he thought Hook had discriminated and retaliated against him.[137] On February 12, 2010, Dr. Alkhawaldeh complained to Bill Lewis, David Wilkins, Marianne Besaw, and Sharon Barnes about Hook's intimidating and aggressive behavior during a project meeting and the hostile work environment created by Hook.[138]

On February 24, 2010, Dr. Alkhawaldeh emailed Lewis, Wilkins, Besaw and Barnes asking whether it was consistent with Dow's policy to force him to meet with Hook when he had complained of Hook's intimidating, condescending and disrespectful treatment and unfair performance review.[139] He also asked for an explanation of Barnes' statement that his ranking on the 2009 Performance Review would not be changed no matter the outcome of Dow's investigation.[140]

On February 25, 2010, Dr. Alkhawaldeh signed the formal PIP document entitled, Notification of Performance Improvement Period.[141] Dr.Dr. Alkhawaldeh's PIP identified the areas in which Hook said Dr. Alkhawaldeh failed to meet

---

[136] Ex. F (Dizer Depo.) 69:22-70:9, ROA.1284-1285.
[137] Ex. B (Hook Depo.) 272:5-17, ROA.938.
[138] Ex. A (Alkhawaldeh Depo.) Ex. 86, ROA.795.
[139] Ex. E (Barnes Depo.) Ex. 11, ROA.1238-1239.
[140] Ex. E (Barnes Depo.) Ex. 11, ROA.1238-1239.
[141] Ex. A (Alkhawaldeh Depo.) 168:23-170:6, ROA.723-725. Ex. 102, ROA.798-800.

expectations and set out goals that Dr. Alkhawaldeh was required to complete and the deadlines by which he had to complete them.[142] A PIP is written plan that identifies areas in which an employee needs to improve and lists the goals that need to be accomplished by the employee.[143] There is a written PIP plan that reflects what is going to be worked on so that there are no misunderstandings or confusion about what is required of the employee.[144] The goals are designed so that the employee can demonstrate that he can satisfactorily perform in the areas addressed by the goals, including the what, the how and the deadlines.[145] The purpose of the PIP is to give the employee an opportunity to show that he can actually perform at an acceptable level in the areas identified as needing improvement.[146]

If the employee meets the goals and performs them in a timely manner, then the employee satisfactorily completes the PIP.[147] Satisfactorily complete of the PIP demonstrates the employee is performing at a satisfactorily level.[148]

As Barnes explained Dr. Alkhawaldeh's PIP to Wilkins and Besaw, "The PIP is simply an outline of project goals he needs to hit over the next 2-3 months."[149] Dr. Alkhawaldeh's PIP essentially required him to perform his job and was designed to

---

[142] Ex. E (Barnes Depo.) 226:22-227:15, ROA.1218-1219.
[143] Ex. E (Barnes Depo.) 166:21-167:23, ROA.1197-1198.
[144] Ex. E (Barnes Depo.) 169:1-16, ROA.1200. 170:9-11, ROA.1201.
[145] Ex. E (Barnes Depo.) 166:21-167:23, ROA.1197-1198.
[146] Ex. E (Barnes Depo.) 167:24-168:7, ROA.1198-1199.
[147] Ex. F (Dizer Depo.) 69:22-70:9, ROA.1284-1285.
[148] Ex. F (Dizer Depo.)
[149] Ex. E (Barnes Depo.) Ex. 16, ROA.1240-1245.

determine whether Dr. Alkhawaldeh could perform his actual job.[150] Dr. Alkhawaldeh needed to perform the PIP to keep his job.[151]

There are only two outcomes for a PIP – it is either successfully completed or not.[152] The PIP has goals, somebody tracks the employee's performance versus the goals, and the end result is that the employee either completes the PIP or does not.[153] Completing a PIP means the employee performed everything on the PIP- the what and the how – to his leader's satisfaction.[154] If an employee is removed from a PIP, that indicates that the employee has performed to a satisfactorily level and showed the required sustained improvement.[155] Dr. Alkhawaldeh was not told that if he was removed for the PIP that indicated that his performance improved to a satisfactory level.[156] The only person Dr. Alkhawaldeh had to satisfy on the PIP was Hook.[157] Unsuccessfully completing the PIP would indicate that an employee was not succeeding at a level that would make him competitive with his peers in future calibrations and that the employee was unlikely to rise above a "1" ranking.[158] It also means that the employee was likely to be terminated.[159]

---

[150] Ex. E (Barnes Depo.) 300:18-301:9, ROA.1225-1226. Ex. 16, ROA.1240-1245.
[151] Ex. E (Barnes Depo.) 192:17-21, ROA.1205.
[152] Ex. B (Hook Depo.) 270:16-271:1, ROA.936-937.
[153] Ex. D (Kailasam Depo.) 92:10-23, ROA.1085.
[154] Ex. E (Barnes Depo.) 173:17-20, ROA.1202.
[155] Ex. E (Barnes Depo.) 225:14-17, ROA.1217. 227:25-228:17, ROA.1219-1220.
[156] Ex. E (Barnes Depo.) 225:21-226:3, ROA.1217-1218.
[157] Ex. E (Barnes Depo.) 291:19-21, ROA.1222.
[158] Ex. B (Hook Depo.) 271:2-11, ROA.937.
[159] Ex. B (Hook Depo.) 271:2-272:4, ROA.937-938.

On February 26, 2010, Dr. Alkhawaldeh complaint about Hook was referred to Mike Dizer, Dow's Manager of HR Investigations.[160] On March 1, 2010, Dr. Alkhawaldeh complained to West that the timelines the PIP prepared by Hook were unrealistic.[161] On March 3, 2010 Dizer chastised Dr. Alkhawaldeh for telling Hook that he had been intimidating and condescending, and Dizer accused Dr. Alkhawaldeh of violating the confidentiality of the investigation by communicating with Hook.[162] Almost immediately, Dr. Alkhawaldeh was suspended from work and given no reason for his suspension.[163] Hook had never previously had any other employee suspended.[164] According to Barnes, Dr. Alkhawaldeh was suspended because it can be easier to perform an investigation when the complainant is not in the workplace.[165] Hook was not suspended.[166] In this regard, Dr. Alkhawaldeh was treated differently than Hook.[167]

The day after he was suspended, Dr. Alkhawaldeh wrote to Andrew Liversis, Chairman and CEO of Dow, and William Banholzer, Kailasam's boss and Executive VP of Dow R&D, complaining that he was being retaliating against for filing

---

[160] Ex. A (Alkhawaldeh Depo.) 170:17-22, ROA.725. Ex. 104, ROA.801-802.
[161] Ex. A (Alkhawaldeh Depo.) 173:12-174:3, ROA.726-727. Ex. 108, ROA.803-805.
[162] Ex. A (Alkhawaldeh Depo.) Ex. 114, ROA.806-808.
[163] Ex. A (Alkhawaldeh Depo.) 185:2-3, ROA.728. Ex. 121, ROA.809-813.
[164] Ex. B (Hook Depo.) 287:7-8, ROA.943.
[165] Ex. E (Barnes Depo.) 304:7-305:1, ROA.1227-1228.
[166] Ex. E (Barnes Depo.) 305:21-22, ROA.1228.
[167] Ex. E (Barnes Depo.) 306:22-307:3, ROA.1229-1230.

complaints against Hook and others.[168] Although it was appropriate for Dr. Alkhawaldeh to take his complaints up the chain of command to Liveris and Banholzer,[169] Kailasam was upset that Dr. Alkhawaldeh had done so and admitted that it bothered him that Dr. Alkhawaldeh had complained to all of the people he had.[170] Kaliasam did not appreciate Dr. Alkhawaldeh complaining to Dow's CEO and did not like that he complained to his boss.[171] Kailasam told Barnes that Dr. Alkhawaldeh' complaint to Liveris "was not the type of limelight we want[]".[172]

According to Barnes, Kailasam was not happy about the fact that Banholzer and Liveris knew about Dr. Alkhawaldeh's complaints.[173] According to West, Kailasam was not pleased that Dr. Alkhawaldeh had complained to Kailasam's boss.[174] Barnes also expressed her consternation that Dr. Alkhawaldeh had elevated his complaints to Liveris, Banholzer, and others, and expressed her concern that the situation could affect her performance rating.[175]

---

[168] Ex. A (Alkhawaldeh Depo.) 185:8-186:12, ROA.728-729. 188:2-8, ROA.730. Ex. 121, ROA.809-813. Ex. B (Hook Depo.) 42:24-43:2, ROA.882-883. 45:9-12, ROA.884. Ex. C (West Depo.) 141:7-9, ROA.1039. Ex. D (Kailasam Depo.) 129:11-130:10, ROA.1096-1097.

[169] Ex. C (West Depo.) 140:15-141:17, ROA.1038-1039.

[170] Ex. C (West Depo.) 141:18-142:21, ROA.1039-1040. Ex. D (Kailasam Depo.) 131:5-11, ROA.1098. 226:21-23, ROA.1109. Ex. E (Barnes Depo.) 311:17-312:2, ROA.1233-1234.

[171] Ex. D (Kailasam Depo.) 131:5-17, ROA.1098.

[172] Ex. C (West Depo.) 223:10-19, ROA.1051. Ex. 7, ROA.1149. Ex. D (Kailasam Depo.) 132:16-136:20, ROA.1099-1103. 138:20-139:6, ROA.1104-1105. Ex. 25, ROA.1149.

[173] Ex. E (Barnes Depo.) 194:7-18, ROA.1206. 195:25-196:6, ROA.1207-1208.

[174] Ex. C (West Depo.) 224:3-6, ROA.1052-1053.

[175] Ex. C (West Depo.) Ex. 7, ROA.1149. Ex. E (Barnes Depo.) 307:21-309:1, ROA.1230-1232. Ex. F (Dizer Depo.) 178:3-17, ROA.1291.

Barnes conceded the fact that Dr. Alkhawaldeh had written complaint letters to Liveris and Banholzer could have been why Kailasam wanted to fire Dr. Alkhawaldeh.[176]

On March 17, 2010 Dr. Alkhawaldeh complained via email to Hook, West, and Lewis that he believed the PIP was unfair and discriminatory.[177] He also complained that Hook retaliated against him by putting him on a PIP.[178]

On April 1, 2010, when Dr. Alkhawaldeh asked Hook why he asked Dr. Alkhawaldeh to do two MOC's for a project instead of a normal one, Hook responded, "This is not Arabia. If you don't like it, go back and buy yourself a camel."[179] Although Hook denies ever making this statement, he agrees that such a statement is inappropriate because it disparages an individual's culture and national origin.[180] Barnes testified that she did not investigate Dr. Alkhawaldeh's complaint about this comment and had not seen anything to indicate that his complaint was investigated.[181]

The following day, Dr. Alkhawaldeh filed a charge of discrimination with the EEOC alleging discrimination based on color and national origin.[182] He asserted that

---

[176] Ex. E (Barnes Depo.) 195:7-22, ROA.1207.
[177] Ex. A (Alkhawaldeh Depo.) 190:5-191:5, ROA.731-732. Ex. 126, ROA.814-816.
[178] Ex. A (Alkhawaldeh Depo.) Ex. 126, ROA.814-816.
[179] Ex. A (Alkhawaldeh Depo.) 24:4-25, ROA.673.
[180] Ex. B (Hook Depo.) 130:11-131:9, ROA.902-903.
[181] Ex. E (Barnes Depo.) 127:18-128:11, ROA.1191-1192.
[182] Ex. A (Alkhawaldeh Depo.) Ex. 136, ROA.824.

Hook had given preferential treatment to Eric Ripplinger, a white American, by removing important and visible work from Dr. Alkhawaldeh and giving it to Ripplinger.[183] Hook was informed that Dr. Alkhawaldeh had filed a complaint with the EEOC.[184] Barnes told Hook with respect to the EEOC charge, "They will investigate; however, I cannot imagine that they will substantiate his claims. Hang in there, Bruce…this too shall pass."[185]

On April 21, 2010, Dr. Alkhawaldeh reported to Hook, West, Dizer, Lewis, and others that he was overloaded with tasks and unrealistic PIP deadlines that Hook refused to adjust the deadlines.[186] Dr. Alkhawaldeh also accused Hook of implementing a discriminatory agenda and asked Dow HR to intervene.[187] On April 12, 2010, Dr. Alkhawaldeh received a letter from Dizer stating that he was unable to substantiate Dr. Alkhawaldeh's complaints about Hook.[188] Remarkably, Dizer concluded, "It would seem that Hook is one of Dr. Alkhawaldeh's biggest supporters…"[189]

On April 21, 2010, Dr. Alkhawaldeh emailed Hook, West, Dizer, and Lewis communicating that the PIP was being used as a tool to fire him and implement

---

[183] Ex. A (Alkhawaldeh Depo.) Ex. 136, ROA.824.
[184] Ex. D (Kailasam Depo.) Ex. 35, ROA.1162-1165.
[185] Ex. D (Kailasam Depo.) Ex. 35, ROA.1162-1165.
[186] Ex. D (Kailasam Depo.) Ex. 34, ROA.1159-1161.
[187] Ex. D (Kailasam Depo.) Ex. 34, ROA.1159-1161.
[188] Ex. A (Alkhawaldeh Depo.) 198:15-199:8, ROA.733-734. Ex. 131, ROA.817-823. Ex. 139, ROA.825-827.
[189] Ex. A (Alkhawaldeh Depo.) Ex. 131, ROA.817-823.

Hook's "discriminatory agenda that he had been pursuing for the last year and a half.[190] Dr. Alkhawaldeh also emailed Dizer, Rick Cassiday, Director of North American HR for Dow,[191] Bill Lewis, and Jim Bailey, Barnes' boss and the HR head for R&D,[192] criticizing Dizer's investigation stating that he had been requesting for months that HR intervene to end Hook's discriminatory, condescending, and intimidating behavior.[193]

In late April 2010, Dr. Alkhawaldeh was assigned to clean up the parking lot outside the lab building as part of the annual clean up day.[194] Hook made the assignment through the committee chair, Hannah Crampton.[195] Hook specifically told Crampton that Dr. Alkhawaldeh was the owner of the outside parking lot, although Dr. Alkhawaldeh was not aware of this.[196] During Dr. Alkhawaldeh's employment at Dow, he had never seen FS/FLs cleaning the parking lot. It had always been cleaned by lab technicians.[197]

On May 4, 2010, Dr. Alkhawaldeh emailed Rick Cassiday.[198] His email was titled "Discrimination Continues."[199] The email began, "I am writing to you to seek

---

[190] Ex. A (Alkhawaldeh Depo.) Ex. 140, ROA.828-829.
[191] Ex. A (Alkhawaldeh Depo.) 220:18-21, ROA.740.
[192] Ex. E (Barnes Depo.) 21:24-22:9, ROA.371-372.
[193] Ex. A (Alkhawaldeh Depo.) Ex. 142, ROA.830-833.
[194] Ex. A (Alkhawaldeh Depo.) 27:3-7, ROA.676.
[195] Ex. A (Alkhawaldeh Depo.) 27:8-12, ROA.676.
[196] Ex. A (Alkhawaldeh Depo.) 28:11-17, ROA.677.
[197] Ex. A (Alkhawaldeh Depo.) 28:23-29:13, ROA.677-678.
[198] Ex. A (Alkhawaldeh Depo.) 207:23-208:3, ROA.735-736. Ex.150, ROA.834-836.
[199] Ex. A (Alkhawaldeh Depo.) 207:23-208:3, ROA.735-736. Ex.150, ROA.834-836.

your help to stop what I believe is a discriminatory behavior against me…."[200] Dr. Alkhawaldeh referenced "a specific racist remark that my manager Bruce Hook made [in] early April and which I mentioned in my email to Mr. Dizer at the time (4-12-2010).…"[201] Dr. Alkhawaldeh also reported other discriminatory remarks he had to endure and disparate treatment by Hook, who singled Dr. Alkhawaldeh out for certain tasks.[202] Dr. Alkhawaldeh noted that Rudolf's statement regarding the briefcase that Dr. Alkhawaldeh had won was discriminatory because it stereotyped Arabs.[203] Dr. Alkhawaldeh explained that when he told Hook that his comment – "When you come from the part of the world where you came from, there is a perception and perception is reality and you have to accept that" – was offensive and discriminatory, Hook became upset.[204] Dr. Alkhawaldeh also made it clear that the 2009 Performance Review was the beginning of a paper trial that would enable Hook to fire him based on performance because he had objected to Hook's condescending, intimidating, and discriminatory behavior towards him. [205] Dr. Alkhawaldeh asked Cassiday for a transfer to another department outside of Epoxy R&D.[206] Cassiday rejected Dr. Alkhawaldeh's request, telling Dr. Alkhawaldeh that HR matters were

---

[200] Ex. A (Alkhawaldeh Depo.) Ex. 150, ROA.834-836.
[201] Ex. A (Alkhawaldeh Depo.) Ex. 150, ROA.834-836. (underlining in original).
[202] Ex. A (Alkhawaldeh Depo.) Ex. 150, ROA.834-836.
[203] Ex. A (Alkhawaldeh Depo.) Ex. 150, ROA.834-836.
[204] Ex. A (Alkhawaldeh Depo.) Ex. 150, ROA.834-836.
[205] Ex. A (Alkhawaldeh Depo.) Ex. 150, ROA.834-836.
[206] Ex. A (Alkhawaldeh Depo.) Ex. 150, ROA.834-836.

best managed by HR professionals and management at Dr. Alkhawaldeh's location.[207]

The morning after receiving Dr. Alkhawaldeh's complaint, Cassiday emailed Dizer, Skaggs, Bailey and Barnes suggesting "we convene a ERM [Employee Review Meeting] to review this situation and determine how to proceed."[208] Barnes testified there is no other purpose of an ERM other than to terminate an employee.[209]

In response to Cassiday's suggestion about convening an ERM, Jay Gibson, in-house counsel for Dow inquired, "Has the PIP period ended?"[210] Barnes responded, "Isn't it a bit premature to convene an ERM…unless they are just looking for a path forward??? I'm trying to find [Hook] to see how [Dr. Alkhawaldeh] is progressing. From our discussion last week, he was completing all the PIP items."[211] Barnes then emailed Hook informing him that Dr. Alkhawaldeh had filed an amended EEOC charge and asking how Dr. Alkhawaldeh was doing on his PIP and whether he was complaint.[212]

Hook responded to Barnes stating, "As far as his PIP goes, he is making reasonable progress, although he continually complains about the deadlines and how much he has to do. The creative/innovative aspects are still lacking, but he is doing

---

[207] Ex. A (Alkhawaldeh Depo.) Ex. 150, ROA.834-836.
[208] Ex. D (Kailasam Depo.) Ex. 45, ROA.1169-1173.
[209] Ex. E (Barnes Depo.) 207:12-19, ROA.1209.
[210] Ex. D (Kailasam Depo.) Ex. 46, ROA.1174-1177.
[211] Ex. D (Kailasam Depo.) Ex. 46, ROA.1174-1177.
[212] Ex. D (Kailasam Depo.) Ex. 47, ROA.1178-1182.

the work we have outlined for him."[213] Barnes, commenting to Gibson about Hook's response stated, "Looks like he is a compliant…next steps? They are ready to ERM, but I am not so sure…[214] Gibson responded to Barnes, "I agree. If he is complying with the terms of the PIP, then what would be the grounds for an ERM?"[215]

 On May 11, 2010 Dr. Alkhawaldeh told Lisa Skaggs, that Hook was increasing his workload without making appropriate adjustments to his PIP deadlines, and thus utilizing the PIP as a tool to enable Hook to fire him.[216]On May 12, 1010, Hook notified Barnes, West, and Kailasam that Dr. Alkhawaldeh continued to make reasonable progress against the tasks on his PIP."[217]

On May 13, 2010, Dr. Alkhawaldeh filed an amended charge of discrimination with the EEOC adding a retaliation claim, asserting that Hook was retaliating against him because of his complaints about color and national origin discrimination.[218] On June 9, Hook reported that, with respect to Dr. Alkhawaldeh's PIP,

> FYI. Ammar's attitude was somewhat better today during progress review. He appeared cooperative and not hostile. Results are moving along and his completing objectives.[219]

Barnes responded to Hook's email, stating in pertinent part:

---

[213] Ex. D (Kailasam Depo.) Ex. 47, ROA.1178-1182.
[214] Ex. D (Kailasam Depo.) Ex. 47, ROA.1178-1182.
[215] Ex. E (Barnes Depo.) Ex. 23, ROA.1250-1257.
[216] Ex. A (Alkhawaldeh Depo.) Ex. 156, ROA.837-838.
[217] Ex. A (Alkhawaldeh Depo.) Ex. 160, ROA.839.
[218] Ex. A (Alkhawaldeh Depo.) 215:6-10, ROA.737. Ex. 167, ROA.840.
[219] Ex. E (Barnes Depo.) Ex. 24, ROA.1258-1259.

The EEOC has conferred with Ammar and he will agree to drop the charge in return for the following. My responses to them are below in blue…

However, here are my responses to Ammar's "demands".

1. Respectful treatment – he will get that and he has gotten that… although he might not recognize it.
2. PIP cancelled – PIP will cancel once he has completed it… and I understand that he has done almost everything listed.

3. Transfer to different department – We will try to make that happen via the JAS… I am not sure if we can just place someone where no opening currently exists… I am not sure if we can "design" a job just for him…I think that's a hardship on TDCC.

4. Raise – I don't see that happening at this juncture…[220]

On June 25, 2010, Dr. Alkhawaldeh filed a discrimination complaint with Dow Global Compliance.[221] Dr. Alkhawaldeh reiterated his complaint that in December 2009, Hook told him that Arabs have a different perception about the way things are done and their perception is wrong.[222] He also re-urged his complaint, in April 2010, Hook told him to go back to Arabia and get a camel.[223] On June 28, 2010, Dr. Alkhawaldeh reasserted in an email to West, Kailasam, Skaggs, Barnes, Cassiday, and others, his accusation that Hook was engaging in a retaliatory and discriminatory

---

[220] Ex. E (Barnes Depo.) Ex. 24, ROA.1258-1259.
[221] Ex. A (Alkhawaldeh Depo.) Ex. 170, ROA.843-844.
[222] Ex. A (Alkhawaldeh Depo.) Ex. 170, ROA.843-844.
[223] Ex. A (Alkhawaldeh Depo.) Ex. 170, ROA.843-844.

campaign against him and that West and Kailasam are doing nothing to stop it.[224] The same day, Barnes emailed Kailasam, West, Bailey stating, "Jay [Gibson] strongly opposes any termination because it will appear as retaliation on the part of [Dow]. And with retaliation, there are no caps on payout."[225]

On June 29, 2010, Dizer informed Dr. Alkhawaldeh that he would be investigating Dr. Alkhawaldeh's complaints against Hook made on June 25 and June 27, 2010.[226] In an email to Mike Dizer and Lisa Skaggs on June 29, 2010, Dr. Alkhawaldeh expressed concern that Hook might physically retaliate against him outside of work.[227] Dizer responded, "Thank you for the additional information. I will contact you in the near future with the status of the investigation into your complaint and will document the findings."[228] Barnes testified that it would not be right if Dizer did nothing after being told by Dr. Alkhawaldeh that he felt physically threatened by Hook.[229] But, he did nothing.

On the same day, Rick Cassiday emailed Dizer, Barnes, Besaw, and Gibson, Lewis and Sepesy about Dr. Alkhawaldeh's latest complaint to Dow's ethics line.[230] Barnes responded to all recipients saying that Hook denied the comment about going

---

[224] Ex. A (Alkhawaldeh Depo.) Ex. 172, ROA.850-851.
[225] Ex. E (Barnes Depo.) Ex. 25, ROA.1260-1261.
[226] Ex. A (Alkhawaldeh Depo.) Ex. 174, ROA.852.
[227] Ex. A (Alkhawaldeh Depo.) Ex. 176, ROA.853-854.
[228] Ex. A (Alkhawaldeh Depo.) Ex. 176, ROA.853-854.
[229] Ex. E (Barnes Depo.) Ex. 28, ROA.1262-1265.
[230] Ex. E (Barnes Depo.) Ex. 28, ROA.1262-1265.

back to Arabia and getting a camel but "he did own up to saying claims 1-2 of the other claims."[231] Barnes also indicated that Hook's and Dr. Alkhawaldeh's leaders "are tired of this entire situation."[232] She acknowledged that Dr. Alkhawaldeh was working through his PIP but claimed that he did not have a good attitude.[233] She also stated that the situation had created some contention amongst folds in Midland – Dow's corporate headquarters.[234]

By June of 2010, although Dr. Alkhawaldeh was performing satisfactorily on his PIP, West was tired and frustrated with the situation.[235] On July 1, 2010, Barnes asked Dr. Alkhawaldeh if he had any intention of leaving Dow.[236] Dr. Alkhawaldeh responded that he had no plans to leave Dow, that he was committed to Dow and his work at Dow, and he would continue to do his job.[237] Dr. Alkhawaldeh repeated his request to be transferred to work under a different supervisor.[238]

In a second meeting that day with Barnes and West, Barnes told Dr. Alkhawaldeh that he had two options: (1) leave Dow with some financial assistance; or (2) be transferred to work under West's supervisor until another position became

---

[231] Ex. E (Barnes Depo.) Ex. 28, ROA.1262-1265.
[232] Ex. E (Barnes Depo.) Ex. 28, ROA.1262-1265.
[233] Ex. E (Barnes Depo.) Ex. 28, ROA.1262-1265.
[234] Ex. E (Barnes Depo.) Ex. 128, ROA.1262-1265. Ex. F (Dizer Depo.) 24:9-44, ROA.1276.
[235] Ex. C (West Depo.) 211:7-17, ROA.1050.
[236] Ex. A (Alkhawaldeh Depo.) Ex. 177, ROA.855-856.
[237] Ex. A (Alkhawaldeh Depo.) Ex. 177, ROA.855-856.
[238] Ex. A (Alkhawaldeh Depo.) Ex. 177, ROA.855-856.

available with Dow.[239] Dr. Alkhawaldeh believed the transfer was a good option at the time.[240] Dr. Alkhawaldeh was also told that he was no longer on the Performance Improvement Plan[241] and that he would be transferred, reporting directly to West, until another position with Dow became available.[242]

After the meeting, Barnes emailed Mike Dizer, Jay Gibson, Marianne Besaw, Lisa Skaggs, Rick Cassiday, Jim Bailey, Bill Lewis, and Joe Sepesy and "Update" on Dr. Alkhawaldeh which stated, "The PIP has been declared as complete and [Dr. Alkhawaldeh] will now be allowed to perform on his own.[243] West and Kailasam understood that Dr. Alkhawaldeh completed his PIP.[244] Kailasam testified that, having completed his PIP, Dr. Alkhawaldeh could not have been fired for failing to complete it.[245]

However, even though Dr. Alkhawaldeh had completed his PIP, Kailasam wanted him fired by the end of August because he was upset that Dr. Alkhawaldeh

---

[239] Ex. A (Alkhawaldeh Depo.) Ex. 179, ROA.857.
[240] Ex. A (Alkhawaldeh Depo.) 224:9-14, ROA.741.
[241] Ex. A (Alkhawaldeh Depo.) Ex. 179, ROA.857.
[242] Ex. A (Alkhawaldeh Depo.) Ex. 179, ROA.857.
[243] Ex. D (Kailasam Depo.) Ex. 44, ROA.1168. See also Ex. A (Alkhawaldeh Depo.) 33:4-7, ROA.679. (Dr. Alkhawaldeh testified that he completed his PIP.)
[244] Ex. C (West Depo.) 258:20-259:2, ROA.1055-1056. Ex. D (Kailasam Depo.) 242:18-20, ROA.1112. 243:1-24, ROA.1113.
[245] Ex. D (Kailasam Depo.) 245:11-246:5, ROA.1114-1115.

took his complaints to Bill Banholzer, Kailasam's boss.[246] Dr. Alkhawaldeh was ultimately fired on September 28, 2010.[247]

On July 6, 2010, Dr. Alkhawaldeh was moved from his old office in building 4810 to a new office in building 1608 and told to report to David West.[248] On July 15, 2010, Jay Gibson wrote in Dow's position statement to the EEOC that Dr. Alkhawaldeh had been moved to a different area within the work group reporting to a different supervisor and would not work to complete his PIP.[249] By this time, Dr. Alkhawaldeh had already completed his PIP.

On July 26, 2010, Barnes reported that "All seems to be working well for now."[250] In a separate email, Barnes told Gibson and Dizer, "I really think we need that external company to come and investigate. From what I've heard, there have been others who have experienced some of this behavior from [Hook]. The[re] may have been who we may have not talked to."[251] No external company was brought in to perform an independent investigation.[252]

On September 2, 2010, Dow scheduled an ERM for September 13, 2010 to "discuss" Dr. Alkhawaldeh.[253] The ERM was attended by West, Hook, Barnes,

---

[246] Ex. E (Barnes Depo.) Ex. 30, ROA.1266-1269.
[247] Ex. E (Barnes Depo.) Ex. 30, ROA.1266-1269.
[248] Ex. E (Barnes Depo.) 56:20-57:2, ROA.1185-1186. Ex. 30, ROA.1266-1269
[249] Ex. G at 5, ROA.1298-1299.
[250] Ex. E (Barnes Depo.) Ex. 31, ROA.1270-1271.
[251] Ex. E (Barnes Depo.) Ex. 31, ROA.1270-1271.
[252] Ex. E (Barnes Depo.) 368:16-18, ROA.1235.
[253] Ex. E (Barnes Depo.) Ex. 32, ROA.1272-1273.

Gibson, and Ludovic Valette.[254] Each of the attendees had the opportunity to provide input on the decision to terminate Dr. Alkhawaldeh.[255] Hook, who also had input into Alkhawaldeh's firing also testified that he believed Alkhawaldeh should have been fired because he had "destroyed whatever relationships that he had as far as being able to successfully have a career at Dow". Hook Depo, pg. 295-296, ROA.1057-1058. Notes prepared for the meeting reflect that among the factors considered in deciding to terminate Dr. Alkhawaldeh were his complaints of discrimination and retaliation.[256] The notes reflect that Dr. Alkhawaldeh sent numerous emails to individuals throughout the company, including Bill Banholzer, Andrew Liveris, Rick Cassiday, and Lisa Skaggs and that Dr. Alkhawaldeh contacted individuals outside Dow, including the Council for Islamic Relations in Houston.[257] The notes also indicated that Dr. Alkhawaldeh had filed a charge of discrimination against Hook with the EEOC and made complaints to Dow's ethics hotline.[258]

On September 28, 2010, Dr. Alkhawaldeh was terminated with an effective date of October 31, 2010.[259] On September 29, 2010, Dr. Alkhawaldeh filed an

---

[254] Ex. E (Barnes Depo.) Ex. 32, ROA.1272-1273.
[255] Ex. B (Hook Depo.) 294:11-22, ROA.944.
[256] Ex. E (Barnes Depo.) Ex. 32, ROA.1272-1273.
[257] Ex. B (Hook Depo.) 294:11-22, ROA.944.
[258] Ex. B (Hook Depo.) 294:11-22, ROA.944.
[259] Ex. E (Barnes Depo.) Ex. 32, ROA.1272-1273.

amended charge with the EEOC alleging that he was terminated in retaliation for filing EEOC charges and complaining about Dow's discriminatory acts.[260]

On October 19, 2010, Dow told the EEOC that Dr. Alkhawaldeh "was terminated based on his poor performance in 2009 and his failure to complete a Performance Improvement Plan."[261] According to Dow, "[f]ollowing [a] Performance Review, Mr. Alkhawaldeh was placed on a Performance Improvement Plan that he failed to complete".[262] These statements are false. On June 1, 2011, the EEOC issued a Letter of Determination concluding that Dr. Alkhawaldeh was retaliated against under the Title VII of Civil Rights Act of 1964, as amended, and Section 704(A) because [he] made internal complaints and filed several EEOC charges."[263]  The letter further stated, "there is a reasonable cause to believe that [Dow] violated Title VII, in that is subjected [Dr. Alkhawaldeh] to retaliation because he opposed conduct he perceived to be discriminatory and he participated in protected activity by filing EEOC charges".[264]

---

[260] Ex. E (Barnes Depo.) Ex. 32, ROA.1272-1273.
[261] Ex. G at 4-5, ROA.1300.
[262] Ex. G at 4-5, ROA.1300.
[263] Ex. I at 1, ROA.1305-1306.
[264] Ex. I at 1, ROA.1305-1306.

# IV.

## SUMMARY OF THE ARGUMENT

The district court erred in granting summary judgment finding that plaintiff demonstrated no evidence that Dow's reasons for termination were a mere pretext for retaliation and discrimination. While the court assumed, without deciding, that plaintiff demonstrated a prima facie case, the plaintiff had in fact demonstrated a prima facie case. More importantly, Appellant demonstrated both that Dow's reasons for termination were false, and that those providing input into the decision harbored retaliatory and discriminatory intent. In finding no evidence of pretext, the district court ignored this evidence and simply resolved the competing versions of Appellant's termination by deciding all factual inferences in Dow's favor. The order granting Summary Judgement should therefore be reversed.

# V.

## ARGUMENT

### I.   District Court Ignored Overwhelming Evidence of Retaliation in Granting Summary Judgment

   A. Plaintiff showed a prime facie case of retaliation

To establish of a prima facie Title VII retaliation claim, plaintiff must show that: (1) the plaintiff engaged in an activity protected by the statute; (2) an adverse employment action occurred; and (3) a causal link exists between the protected

activity and the adverse employment action. *Zamora v. City of Houston*, 798 F.3d 326, 331 (5th Cir. 2015); *Davis v. Fort Bend County*, 765 F.3d 480, 489-490 (5th Cir. 2014). If a plaintiff makes a prima facie showing, the burden shifts to the defendant to proffer a legitimate rationale for the underlying employment action. *Davis*, 765 F.3d at 490. The burden then shifts back to the plaintiff to demonstrate that the employer's articulated reason for the employment action was a pretext for retaliation. *Id.*

1. *Plaintiff engaged in protected activity*

An employee engages in protected activity when he opposes an illegal practice under Title VII. See 42 U.S.C. § 2000e-3 (a) (prohibiting an employer from discriminating against an employee based on an employee's an illegal practice under Title VII). Filing a charge with the EEOC is protected activity. An informal internal complaint by an employee is also a Title VII protected activity. *Fierros v. Texas Dept. of Health*, 274 F.3d 187, 194 (5th Cir. 2001); *see also Abdulbaki v. Regent Care Center*, 2012 U.S. Dist. LEXIS 43827, * 31 n. 124 (W.D. Tex. March 29, 2010) (An informal complaint of discriminatory conduct is sufficient to constitute protected activity if it includes a "deliberate, targeted attempt to report or complain about the alleged discrimination."). Complaining to supervisors about an illegal practice under Title VII is protected activity. *Carrera v. Comm. Coating Servs. Int'l*,

*Ltd.*, 422 F. App'x 334, 339 (5th Cir. 2000). An EEOC charge is also considered protective activity. *Long v. Eastfield College*, 88 F.3d 300, 304 (5th Cir. 1996).

Dr. Alkhawaldeh engaged in numerous instances of protected activity prior to his termination by Dow. These activities include, but are not necessarily limited to, the following:

- In November 2009, Dr. Alkhawaldeh told his supervisor, Hook, that Hook's comments about the perceptions of Arabs were discriminatory.[265]

- On February 2, 2010, Dr. Alkhawaldeh complained to Barnes, Lewis, Wilkins, and Besaw of hostile work environment created by Hook.[266]

- On March 9, 2010, Dr. Alkhawaldeh reported to Bill Banholzer that he had been suspended from work for filing a complaint against Hook and that Hook had retaliated against him by ranking him a "1" on his 2009 Performance Review and placing him on a PIP after Dr. Alkhawaldeh complained to Hook about Hook's disrespectful behavior.[267]

- On March 17, 2010, Dr. Alkhawaldeh reported to Hook, Lewis, and West that Dow was discriminating against him on a PIP.[268]

- On April 2, 2010, Dr. Alkhawaldeh filed a charge of discrimination with the EEOC.[269]

- On April 12, 2010, Dr. Alkhawaldeh reported to Hook, West, Dizer, and Lewis about Hook's discriminatory agenda and asked Dow HR to intervene to stop the discrimination.[270]

---

[265] Ex. A (Alkahawaldeh Depo.) 127:17-128:3, ROA.710-711.
[266] Ex. A (Alkahawaldeh Depo.) Ex. 86, ROA.795.
[267] Ex. A (Alkahawaldeh Depo.) Ex. 121, ROA.809-813.
[268] Ex. A (Alkahawaldeh Depo.) Ex. 126, ROA.814-816.
[269] Ex. A (Alkahawaldeh Depo.) 218:18-219:19, ROA.738-739. Ex. 171, ROA.845-849.
[270] Ex. A (Alkahawaldeh Depo.) Ex. 140, ROA.828-829.

- On April 13, 2010, Dr. Alkhawaldeh reported to Dizer, Cassiday, Lewis, and Bailey that Dizer had retaliated against him by suspending him from work after he filed a discrimination complaint against Hook and again asked Dow HR to intervene to stop Hook's discriminatory behavior. [271]

- On May 4, 2010, Dr. Alkhawaldeh reported to Cassiday that Hook was discriminating against him and subjecting him to racist remarks.[272]

- On May 11, 2010, Dr. Alkhawaldeh reported to Lisa Skaggs that Hook was retaliating against him because of his complaints against Hook.[273]

- On May 13, 2010, Dr. Alkhawaldeh filed an amended charge of discrimination with the EEOC.[274]

- On June 25, 2010, Dr. Alkhawaldeh filed a complaint with Dow Global Compliance accusing Hook of retaliating against him for reporting Hook to HR.[275]

- On June 28, 2010, Dr. Alkhawaldeh complained to Skaggs, West, Kailasam, Barnes,, and Cassiday about Hook's discriminatory and retaliatory behavior.[276]

2. *Plaintiff was subjected to an adverse employment action*

Dr. Alkhawaldeh plainly suffered an adverse employment action when Dow terminated his employment on September 28, 2010.[277] *Pegram v. Honeywell, Inc.*,

---

[271] Ex. A (Alkahawaldeh Depo.) Ex. 142, ROA.830-833.
[272] Ex. A (Alkahawaldeh Depo.) Ex. 150, ROA.834-836.
[273] Ex. A (Alkahawaldeh Depo.) Ex. 156, ROA.837-838.
[274] Ex. A (Alkahawaldeh Depo.) Ex. 167, ROA.840.
[275] Ex. A (Alkahawaldeh Depo.) Ex. 170, ROA.843-844.
[276] Ex. A (Alkahawaldeh Depo.) Ex. 172, ROA.850-851.
[277] Def's Motion for Summary Judgement at 19, ROA.246. Plaintiff's Complaint at ¶ 158-159, ROA.49. Exhibit C (West Deposition) 227:4-10, ROA.1054.

361 F.3d 272, 282 (5th Cir. 2004) (an adverse employment action includes "employment decisions such as hiring, granting leave, discharging, promoting, and compensating.") Dr. Alkhawaldeh has clearly satisfied the second element of a prima facie case of discrimination.

### 3. *Plaintiff showed a causal link between his terminated and his protected activity*

"Close timing between an employee's protected activity and an adverse against [him] may provide the 'casual connection' required to make out a prima facie case of retaliation." *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001). "[A] time lapse of up to four months has been found sufficient to satisfy the casual connection for summary judgment purposes." *Id.* (quotation omitted). By comparison, timing of five months or more requires additional evidence for summary judgment purposes. *See Feist v. Louisiana, Dept. of Justice*, 730 F.3d 450, 455 (5th Cir. 2013). But here, Appellant has evidence of timing within four months and additional evidence of retaliatory intent.

#### a. Timing

Dr. Alkhawaldeh was terminated on September 28, 2010. Dr. Alkhawaldeh's complaint on June 25, 2010 to Dow Global Compliance and his complaint on June 28, 2010 to Skaggs, West, Kailasam, Barnes, and Cassiday occurred within four months of Dr. Alkhawaldeh's termination. Dr. Alkhawaldeh engaged in protected

conduct at least five times in the five months preceding his termination and at least eight times within six months of his termination. Thus, the temporal proximity of Dr. Alkhawaldeh's complaints to his termination is alone sufficient to raise question as to whether a causal link exists between the protected activity in which he engaged and the adverse employment action he suffered.

### b. Additional evidence

There is additional evidence that, at minimum, established a fact issue as to whether Dr. Alkhawaldeh's complaints were a but-for cause termination. The uncontroverted evidence establishes that Ganesh Kailasam was upset that Dr. Alkhawaldeh complained about discrimination and retaliation to Kailasam's boss and the CEO of Dow.[278] Kailasam admitted that he did not appreciate Dr. Alkhawaldeh complaining to Dow's CEO and did not like the fact that he had complained to Kailasam's boss.[279] Kailasam also complained that Dr. Alkhawaldeh's complaints were not the type of limelight he wanted.[280] Barnes admitted that the fact that Dr. Alkhawaldeh had written complaint letters to Liveris

---

[278] Ex. C (West Depo.) 224:3-6, ROA.1052. Ex. B (Hook Depo) 296, ROA.945. Ex. D (Kailasam Depo.) 131:5-11, ROA.1091. 226:21-23, ROA.1109. Ex. E (Barnes Depo.) 194:7-18, ROA.1206. 196:1-6, ROA.1208. 311:17-312:2, ROA.1233-1234.

[279] Ex. D (Kailasam Depo.) 131:5-17, ROA.1098. Interestingly, the district court not only ignored this as evidence of retaliatory intent, the court held that Alkhawaldeh's conduct is this regard was a legitimate reason for retaliation.

[280] Ex. C (West Depo.) 223:10-19, ROA.1051. Ex. 7, ROA.1149. Ex. D (Kailasam Depo.) 132:16-136:20, ROA.1099-1103. 138:20-139:6, ROA.1104-1105. 138:20-139:6, ROA.1104-1105. Ex. 25, ROA.1149.

and Banholzer may have been the reason why Kailasam wanted to fire Dr. Alkhawaldeh.[281] Indeed, the day after Dr. Alkhawaldeh successfully completed his PIP, Kailasam let it be known that he wanted Dr. Alkhawaldeh fired by the end of August because he was still upset that Dr. Alkhawaldeh took his complaints to Bill Banholzer, Kailasam's boss.[282] Dr. Alkhawaldeh was fired less than three months later.[283]

While Dow takes the position that it was West who made the termination decision, Kailasam was West's boss and West knew that Kailasam wanted Dr. Alkhawaldeh fired. A reasonable jury could conclude that West fired Dr. Alkhawaldeh either at the instruction or Kailasam or because he knew that is what Kailasam wanted.

**B.** <u>In finding no evidence of pretext, Court ignored evidence that Dow's proffered reasons for plaintiff's termination was false.</u>

Pretext may be shown in two ways, either by (1) persuading the Court that a discriminatory reason likely motivated the employer, or (2) showing that the employer's proffered explanation is unworthy of credence. *Burdine*, 450 U.S. at 256; *Hall v. Gillman, Inc.*, 81 F.3d 35, 37 (5th Cir. 1996) same. The question is not

---

[281] Ex. E (Barnes Depo.) Ex. 195:7-22, ROA.1207.

[282] Ex. E (Barnes Depo.) Ex. 30, ROA.1266-1269.

[283] Ex. A (Alkhawaldeh Depo.) 17:14-17, ROA.666. Def's Motion for Summary Judgment at 19, ROA.246.

whether the plaintiff actually proves pretext, but whether the plaintiff raises a genuine issue of fact upon which a fact-finder could conclude that the offered explanations are false. *Hall*, 81 F.3d at 37.

Dow's many, different proffered explanations for Dr. Alkhawaldeh's termination are unworthy of credence. "When an employer offered inconsistent explanations for its employment decisions at different times,…the jury may infer that the employer's proffered reasons are pretextual." *Staten v. New Palace Casino, LLC,* , 187 F. App'x 350, 359 (5th Cir. 2006).

The district court, relying on Dow's claims, held that Dr. Alkhawaldeh was terminated for poor performance. Yet Alkhawaldeh satisfactorily completed his PIP in July 2010,[284] indicating that he was performing his job at a satisfactory level.[285] Dow told the EEOC that Dr. Alkhawaldeh "was terminated based on his poor performance in 2009 and his failure to complete a Performance Improvement Plan"[286] but that explanation was false. Barnes informed Mike Dizer, Jay Gibson, Marianne Besaw, Lisa Skaggs, Ricky Cassidy, Jim Bailey, Bill Lewis, and Joe Sepesy by email, "The PIP has been declared as complete and [ Dr. Alkhawaldeh]

---

[284]Ex. D (Kailasam Depo) Ex. 44, ROA.1168. See also Ex. A (Alkhawaldeh Depo.) 33:4-7, ROA. 679. (Dr. Alkhawaldeh testified that he completed his PIP
[285] Ex. E (Barnes Depo.) 192:17-21, ROA.1205. 225:14-17, ROA.1217. 225:21-226:3, ROA.1217-1218. 227:25-228:17, ROA.1219-1220.
[286] Ex. G at 4-5, ROA.1298-1299.

will now be allowed to perform on his own."[287] West and Kailasam both testified that Dr. Alkhawaldeh completed his PIP.[288]

Kailasam acknowledged that, having completed his PIP, Dr. Alkhawaldeh could not have been properly firing for failing to complete it.[289] Dow's statement to the EEOC that Dr. Alkhawaldeh was terminated for failing to complete his PIP is false. Moreover, while Dow also told the EEOC that Dr. Alkhawaldeh's poor performance in 2009 was a reason for his termination, Barnes testified that Dr. Alkhawaldeh was terminated for poor performance for the work he performed for West following his transfer in July 2010.[290]

Clearly, the EEOC believed Dow's stated reason for Dr. Alkhawaldeh's termination was pretextual because it determined that "there is a reasonable cause to believe that [Dow] violated Title VII, in that it subjected [Dr. Alkhawaldeh] to retaliation because he opposed conduct  he perceived to be discriminatory and he participated in protected activity by filing EEOC charges."[291] The EEOC rejected

---

[287] Ex. D (Kailasam Depo) Ex. 44, ROA.1168. See also Ex. A (Alkhawaldeh Depo.) 33:4-7, ROA. 679. (Dr. Alkhawaldeh testified that he completed his PIP
[288] Ex. C (West Depo) 258:20-259:2, ROA. 1055-1056. Ex. D (Kailasam Depo.) 242:18-20, ROA.1112. 243:1-24, ROA.1113.
[289] Ex. D (Kailasam Depo.) 245:121-246:5, ROA.1114-1115.
[290] Ex. E (Barnes Depo.) 212:10-213:10, ROA.1210-1211.
[291] Ex. I at 1., ROA.1305-1306.

Dow's purported explanation for its termination of Dr. Alkhawaldeh, a jury could reach the same conclusion based on the summary judgment evidence.[292]

Dow's story regarding Dr. Alkhawaldeh's termination is also entitled to no credence because of the contradictory natural of the testimony of its witnesses. Contrary to her July 1, 2010 email indicating that Dr. Alkhawaldeh's PIP had been "completed", Barnes testified during her deposition that Dr. Alkhawaldeh's PIP had been "cancelled", "terminated", or "discontinued", not completed.[293] Presumably, Barnes changed her story because if Dr. Alkhawaldeh actually completed his PIP that would be inconsistent with Dow's story that his 2010 performance was poor, and it would also be contrary to what Dow told the EEOC.

Hook testified that Dr. Alkhawaldeh's PIP was "terminated,"[294] but he said he did know what it meant. He had never heard of a PIP being terminated.[295] According to Hook, there were only two outcomes for a PIP – an employee either completes it or does not.[296] Dow's "evidence" that Dr. Alkhawaldeh's terminated was based on his poor performance is entitled to no credence because it is internally inconsistent, contradictory, and has evolved over time.

---

[292] The district court ignored the EEOC finding. This court has held that while such finding is not dispositive, the district court at least is "required to take an EEOC investigative report into consideration" because the "failure to do so would be 'wasteful and unnecessary.'" *Price*, 283 F.3d at 275 (quoting *Smith v. Universal Servs., Inc.*, 454 F.2d 154, 157 (5th Cir. 1972)).

[293] Ex. E (Barnes Depo.) 213:15-214:12, ROA.1211-1212

[294] Ex. B (Hook Depo.) 273:13-274:7, ROA.939-940.

[295] Ex. B (Hook Depo.) 274:4-11, ROA.940. 274:15-25, ROA.940.

[296] Ex. E (Hook Depo.) 274:12-14, ROA.940.

In any event, a jury could reasonably infer from the fact that Kailasam wanted Dr. Alkhawaldeh terminated just one day after he completed his PIP, (and thus had demonstrated satisfactory performance)[297], that the true reason Alkhawaldeh was terminated was because Kailasam was upset that Dr. Alkhawaldeh had complained to his boss, Bill Banholer, and Andrew Liveris, the CEO of Dow about discrimination and harassment.[298] Indeed, a jury could determine that Kailasam's desire to terminate Dr. Alkhawaldeh had no contention to Dr. Alkhawaldeh's abilities or performance because Kailasam had no contact with Dr. Alkhawaldeh prior to Dr. Alkhawaldeh's complaints;[299] met with Dr. Alkhawaldeh one time following Dr. Alkhawaldeh's complaints;[300] had no basis to evaluate Dr. Alkhawaldeh's knowledge and skills as a chemical engineer;[301] did not try to determine if Dr. Alkhawaldeh's 2009 Performance Review was accurate;[302] took no steps to determine for himself if Dr. Alkhawaldeh's knowledge and skills in chemical engineering were;[303] and was not concerned whether or not Hook had given

---

[297] Ex. E (Barnes Depo.) 225:14-17, ROA.1217. 227:25-228:17, ROA.1219-1220.
[298] Ex. C (West Depo.) 141:18-142:21, ROA.1039-1040. Ex. D (Kailasam Depo.) 131:5-17, ROA.1098. 226:21-23, ROA.1109. Ex. E (Barnes Depo.) 311:17-312:2, ROA.1233-1234.
[299] Ex. D (Kailasam Depo.)16:2-14, ROA.1065.
[300] Ex. D (Kailasam Depo.) 16:2-11, ROA.1065.
[301] Ex. D (Kailasam Depo.) 42:22-43:5, ROA.1074-1075.
[302] Ex. D (Kailasam Depo.) 69:23-70:1, ROA.1077-1078. 84:1-15, ROA.1079.
[303] Ex. D (Kailasam Depo.) 44:10-14, ROA.1076.

Dr. Alkhawaldeh a "1" rating on his 2009 Performance Review in retaliation for his discrimination complaints about Hook.[304]

Given Dow's inconsistent positions regarding the reasons for Dr. Alkhawaldeh's termination and Kailasam's determination to fire Dr. Alkhawaldeh despite the fact that he satisfactorily completed his PIP, a fact issue clearly exists as to whether Dow's explanation for Dr. Alkhawaldeh termination is pretextual. Because Dr. Alkhawaldeh had established a prima facie case of discrimination and provided substantial evidence that Dow's proferred reason for Dr. Alkhawaldeh's termination is false, Dow's motion for summary judgment should be denied. *Reeves*, 530 U.S. at 148 (2009).

It should also be noted that in finding no evidence of pretext the court resolved all inferences against Appellant. Dow's evidence in support of its claim that Dr. Alkhawaldeh's termination was based on legitimate motives is premised on contradicted testimony of interested witnesses. Such evidence should not be considered by the Court. *Reeves*, 530 U.S. at 151. Moreover, Dow's evidence of Dr. Alkhawaldeh's purported performance deficiencies is based exclusively on the self-interested testimony of Hook, West, Kailasam, Carlberg and other Dow employees. Indeed, under Dow's current version of events, the decision to terminate Dr. Alkhawaldeh was made by West based solely on his observations of Dr.

---

[304] Ex. D (Kailasam Depo.) 70:2-6, ROA.1078.

Alkhawaldeh's performance for two months that Dr. Alkhawaldeh reported to him. See Motion at 17-18. West's testimony is clearly not that of a disinterested witness, should be disregarded by the Court, and cannot support summary judgment for Dow.

The Court's holding that Dr. Alkhawaldeh performed poorly or lacked knowledge, creativity, or technical ability was plainly contradicted by the summary judgment record. In May 2009, in the middle of the 2009 performance review period, Dow petitioned for an O-1 visa for Dr. Alkhawaldeh on grounds that he was an alien with extraordinary ability in science.[305] In its petition, Dow represented that Dr. Alkhawaldeh had demonstrated sustained national and international acclaim and recognition in the field of reaction engineering and was one of a small percentage of scientists who had risen to the very top of his field of endeavor.[306] In a letter in support of the O-1 petition, Hook represented that Dr. Alkhawaldeh had diverse and strong research experience and impressive skills in leading and managing research projects that gave him a unique ability to solve complex research problems and made him an important asset for Dow.[307] The petition was also supported by multiple letters from internationally renowned scientists attesting to Dr. Alkhawaldeh's outstanding abilities as a research scientist.[308]

---

[305] Ex. B (Hook Depo.) 154:18-155:1, ROA.907-908. Ex. 5, ROA.950-980. Exhibit C (West Depo.) 71:6-9, ROA.1024.
[306] Ex. B (Hook Depo.) 153:21-154:3, ROA.906-907. 155:2-16, ROA.908. Ex. 5, ROA.950-980.
[307] Ex. B (Hook Depo.) 156:9-157:18, ROA.909-910.
[308] Ex. B (Hook Depo.) Ex. 5, ROA.950-980.

Moreover, in October 2009, at the very end of the 2009 performance period for which Dr. Alkhawaldeh received the lowest possible performance rating, Dow petitioned for permanent residency for Dr. Alkhawaldeh. Hook submitted a letter in support of this petition in which he stated that granting residency to Dr. Alkhawaldeh was in the best interests of Dow and the United States.[309] At no time during Dr. Alkhawaldeh's employment with Dow withdraw either its petition for the O-1 visa or its petition for permanent residency. The letters of support from May and October 2009 as well as Dow's petitions for the O-1 visa and permanent residency are inconsistent with and the notion that Dr. Alkhawaldeh lacked basic scientific knowledge, skills, and abilities controverted[310].

The drastic drop in Dr. Alkhawaldeh's performance rating from a "3" in 2008 to a "1" in 2009 is further evidence that the 2009 Performance Rating and Dow's decision to terminate Dr. Alkhawaldeh were motivated by something other than Dr. Alkhawaldeh's actual performance. Both West and Dizer considered a drop from a "3" segmentation to a "1" in one year to be unusual.[311] West was unaware of an employees within Hook's group, other than Dr. Alkhawaldeh, who dropped from a "3" to a "1" in just one year.[312] Dizer said Dr. Alkhawaldeh's drop from a "3" to a

---

[309] Ex. B (Hook Depo.) 187:19-189:1, ROA.924-926. Ex. 10, ROA.992.
[310] Dr. Alkhawaldeh was subsequently rehired by Texas A & M as a researcher and teacher.
[311] Ex. C (West Depo.) 58:1-18, ROA.1023. Ex. F (Dizer Depo.) 98:13-20, ROA.1286.
[312] Ex. C (West Depo) 57:17-21, ROA.1022.

51

"1" was surprising, especially considering the letter of support that Hook wrote in October 2009.[313]

Furthermore, although Hook and Dr. Alkhawaldeh met almost monthly in 2009, Hook never told Dr. Alkhawaldeh that he was in danger of receiving a "1" or "2" calibration for 2009.[314] Nor do Hook's notes of these monthly meetings reflect that Dr. Alkhawaldeh was tracing toward a "1" or "2" segmentation or was in danger of being placed on a PIP.[315] In short, prior to receiving his 2009 performance review, Dr. Alkhawaldeh was never told that he was at risk of being placed on a PIP.[316]

A jury could reasonably infer from the foregoing evidence that the "1" rating did not truly reflect Dr. Alkhawaldeh's performance during 2009. A jury could further infer that, if Dow based Dr. Alkhawaldeh's 2009 Performance Review on something other than Dr. Alkhawaldeh's true performance, it could have also based its decision to terminate Dr. Alkhawaldeh on something other than his true performance, such as his race, religion, national origin, or his complaints of discrimination and retaliation.

This evidence, together with Dow's previous statements, and other evidence, are directly contradictory to Dow's claim that Alkhawaldeh was fired for

---

[313] Ex. F (Dizer Depo.) 149:8-150:10, ROA.1289-1290. Ex. D (Kailasam Depo.)36:6-39:10, ROA.1070-1073. Ex. 18, ROA.1118-1129.
[314] Ex. B (Hook Depo.) 194:23-195:19, ROA.927-928. 197:2-198:11, ROA.929-930.
[315] Ex. B (Hook Depo.) Ex. 11, ROA.993-1000.
[316] Ex. B (Hook Depo.) 229:10-231:9, ROA.931-933.

performance. The District Court, in granting summary judgment simply chose from two permissible inferences regarding Alkhawaldeh's termination.[317]

Accordingly, the summary judgment evidence in front of the district court was more than sufficient to raise a fact issue as to whether Dow's articulated reason for Dr. Alkhawaldeh termination was pretextual, precluding summary judgment on Dr. Alkhawaldeh's retaliation claim.

## II.    District Court resolved disputed evidentiary issues in Dow's favor in granting Summary Judgment

### A.    Court improperly found that Plaintiff did not show a prima facie case of discrimination.

To establish a *prima facie* case of discrimination, a plaintiff must show that: 1) he is a member of a protected class: 2) he was qualified for the position that he held; 3) he suffered an adverse employment action; and 4) he was replaced by someone outside his protected class or treated less favorably than others outside the protected class. *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007). In order to state a *prima facie* case, a plaintiff need only make a very minimal showing. *Nichols v. Loral Vought Systems Corp.*, 81 F.3d 38, 41 (5th Cir. 1996); see also *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (the burden of

---

[317] The Court found that Dow's claim of poor performance was dispositive. Such evidence, of course, was contradicted by summary judgment evidence. Appellant satisfactorily completed the PIP, and none of his alleged poor performance was documented until after he complained about being chastised seeking to comply with dietary restrictions. The month before, he was regarded as having a "distinguished record of success."

showing a *prima facie* case is "not onerous").

The Court assumed the existence of a prima facie case, and in fact Appellant demonstrated on all elements of the prima facie case. As noted above, Dr. Alkhawaldeh was subjected to an adverse employment discrimination when he was terminated by Dow. Nonetheless, the district court argues that Dr. Alkhawaldeh was the only employee at his level and experience who was calibrated a "1" on his 2009 Performance Review, and therefore he cannot point to any other "similarly situated" employees who were not terminated and therefore cannot establish that he was treated less favorably than others outside the protected class. This definition of similarly situated employees is far too restrictive.

Employees in the epoxy R&D group consisted of Functional Scientist/ Functional Leaders ("FS.FL") and lab technicians.[318]  Dr. Alkhawaldeh was an FS/FL.[319] FS/FLs were the scientist within the group.[320] They were divided into three different levels based on their years of experience.[321] During performance reviews, FS/FLs were compared to and ranked against each other as a group.[322] Hook managed and supervised all FS/FLs in epoxy R&D.[323] Dr. Alkhawaldeh was similarly situated with respect to the other FS/FLs in epoxy R&D.

[318] See Ex. B (Hook Depo.) 27:5-24, ROA.876.
[319] Ex. B (Hook Depo.) 32:21-23, ROA.881.
[320] Ex. B (Hook Depo.) 27:15-24, ROA.876.
[321] Ex. B (Hook Depo.) 28:17-30:18, ROA.877-879.
[322] Ex. B (Hook Depo.) 27:5-24, ROA.876. 31:20-32, ROA.880.
[323] Ex. B (Hook Depo.) 8:4-9:3, ROA.861-862.

Dr. Alkhawaldeh was the only employee, and hence the only FS/FL in epoxy R&D to receive "1" segmentation for 2009;[324] the only FS/FL in epoxy R&D put on a Performance Improvement Plan during Dr. Alkhawaldeh's tenure at Dow; the only employee that Hook ever rated a "1" on a performance review in Hook's career at Dow;[325] the only employee Hook ever placed on a Performance Improvement Plan;[326] the only FS/FL in epoxy R&D who dropped from a "3" to a "1" rating in just one year,[327] and the only FS/FL terminated in the epoxy R&D group during Dr. Alkhawaldeh's employment at Dow.[328]

The summary judgment evidence establishes at least a fact issue as to whether Dr. Alkhawaldeh was treated less favorably than other similarly situated employees outside his protected group by being rated a "1", placed on a PIP and ultimately terminated even though he successfully completed the PIP. No other FS/FL was so treated by Dow.

A jury could find on the evidence that Dow rated Dr. Alkhawaldeh a "1" and placed him on a PIP with the intention of firing him in retaliation for his complaints about discrimination and retaliation. Indeed, Kailasam had previously utilized the

---

[324] Ex. B (Hook Depo.) 234:18-23, ROA.934. West, Hook's boss, testified that Hook did not rank Alkhawaldeh a "1" during the calibration process but could not remember what rank he claims Hook gave Dr. Alkhawaldeh. Ex. C. (West Depo.) 128:11-13, ROA.1032. This is just one of many inconsistencies in the testimony of Dow employees involved in Dr. Alkhawaldeh's termination.
[325] Ex. B. (Hook Depo) 242:2-9, ROA.935.
[326] Ex. B (Hook Depo) 242:10-25, ROA.935.
[327] Ex. C (West Depo) 57:17-21, ROA.1022.
[328] Ex. A (Alkhawaldeh Depo.) 25:8-18, ROA.674. 25:24-26:1, ROA.674-675.

PIP process to get rid of employees he wished to terminate. On November 17, 2009, Kailasam emailed Leigh Thompson,[329] one of the leaders in Kailasam's group,[330] stating: "PS: We were going to put Saha on [a] PIP and exit him …he finally quit as we gave him feedback thru the year that he was not cutting it."[331] Barnes and Dizer both testified that Kailasam's email to Leigh Thompson appears to indicate that a decision was made to terminate the employee named Saha, and to accomplish that, he was going to be put on a PIP.[332] As Barnes testified:

> Q. But it looks like they want to get rid of [Saha] and they were going to put him on a PIP and get rid of him. Right?
>
> A. That's what it says here.[333]

B. Court improperly applied "same actor inference".

When the same supervisory employee hires and fires a plaintiff within a short period of time, this can give rise to an inference that discrimination was not a determining factor for an adverse employment action taken by an employer. *Brown v. CSC Logic*, 82 F.3d 651, 658 (5th Cir. 1996). This same-actor inference does "not rule out the possibility that an individual could prove a case of discrimination." *Russell*, 235 F.3d, at 229 n.16. "Although a court may infer an absence of

---

[329] Ex. D (Kailasam Depo) Ex. 42, ROA.1166-1167.
[330] Ex. D (Kailasam Depo) 234:3-14, ROA.1110.
[331] Ex. D (Kailasam Depo) Ex. 42, ROA.1166-1167.
[332] Ex. E  (Barnes Depo) 216:18-219:1, ROA.1213-1216; Ex. F (Dizer Depo) 129:14-130:25, ROA.1287-1288.
[333] Ex. E (Barnes Depo) 218: 23-219:1, ROA. 1215-1216.

discrimination if the same individual hired and fired the plaintiff, such an inference is not required." *Ibrahim v. City of Houston*, 2009 U.S. Dist. LEXIS 31735, * 70 (S.D. Tex. April 15, 2009). "Although the factfinder is permitted to draw this inference, it is by no means a mandatory one, and it may be weakened by other evidence." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 64, 572 (6th Cir. 2003). The same-actor interference "is simply evidence like any other and should not be afforded presumptive value." *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 496 n.6 (3rd Cir. 1995).

Based on the summary judgment record, the same-actor interference should not be applied in this case. It is unclear from the summary judgment evidence cited by Dow exactly who hired Dr. Alkhawaldeh. Hook states he was the "hiring manager" but does not explain what that means.[334] There is no clear testimony that Hook or West made the decision to hire Dr. Alkhawaldeh.[335] West testified, "We eventually hired him…" but does not identify who is included in the term "we".[336] In the absence of clear evidence of who hired Dr. Alkhawaldeh, the same-actor interference should not be applied.

Here, the same-actor inference is greatly weakened by the evidence of

---

[334]Ex. B (Hook Depo.) 14:1, ROA.866.
[335]Ex. B (Hook Depo.) 14:5-10, ROA.866 ; Ex. C (West Depo.) 19:7-10, ROA.1017; 21:13-17, ROA.1018
[336] Ex. C (West Depo.) 19:9-10, ROA.1017.

discriminatory animus by Hook combined with his influence over and input into the

termination decision. Dow claims that West's testimony that Hook was one of Dr.

Alkhawaldeh's "biggest supporters" and "biggest fan[s]" and that he and Hook were

committed to trying to help Dr. Alkhawaldeh improve his performance bolsters the

same-actor inference. Of course, a jury could determine that West testimony is not

credible, especially given the many discriminatory comments made by Hook to Dr.

Alkhawaldeh; the fact that Dr. Alkhawaldeh was the only employee Hook has ever

rated a "1" or place on a PIP; the fact that Hook recommended Dr. Alkhawaldeh's

termination even though he had satisfactorily completed his PIP; and given the

inconsistencies between Hook's performance rating of Dr. Alkhawaldeh and his

assessment of Dr. Alkhawaldeh's abilities in the letters he wrote in support of Dr.

Alkhawaldeh's immigration petitions.

At the very least, there is a fact question , at the very least, as to whether

the  same-actor inference should apply, and therefore it should not be imposed to

defeat  Dr.  Alkhawaldeh's  discrimination  claims  in  a  summary  judgment

proceeding.

C. <u>In finding no evidence of pretext, Court ignored evidence that Dow's proffered reasons for plaintiff's termination was false.</u>

As noted in section IB above, Dow's many, different proffered explanations

for Dr. Alkhawaldeh's termination are "unworthy of credence". In addition to this

evidence, Hook's discriminatory animus toward Dr. Alkhawaldeh's national origin (Jordanian), religion (Muslim), and race (Arab) is well-established When Dr. Alkhawaldeh complained about discriminatory conduct and statements by Six Sigma instructors, Passmore and Rudolf, Hook got angry instructed Dr. Alkhawaldeh not to talk about these things,[337] and told him that there is a perception about people from his part of the world (i.e. the Middle East) and the he had better learn to accept that.[338] When Dr. Alkhawaldeh responded that what Rudolf had said was discriminatory, Hook threw papers at him and ordered him out of his office.[339]

Kailasam admitted that it would be improper for him to Saha on a PIP with the idea that he was going to exit Saha regardless of the outcome of the PIP, because that's not the way the process is supposed to work.[340] A jury could easily conclude that this is exactly what Kailasam and Dow did do to Dr. Alkhawaldeh. They allowed him to be mistreated because of his race, national origin, and religion then fired him because of his complaints about discrimination and retaliation, and to accomplish that goal they put him on a PIP to exit him. When Dr. Alkhawaldeh, perhaps unexpectedly, satisfactorily completed the PIP, they

---

[337] Ex. A (Alkhawaldeh Depo.) 23:3-24:3, ROA.672-673.
[338] Ex. A (Alkhawaldeh Depo.) 20:9-22, ROA.669.
[339] Ex. A (Alkhawaldeh Depo.) 127:17-128:3, ROA.710-711.
[340] Ex. D (Kailasam Depo) 239:12-20, ROA.1111.

fired him anyway claiming that the PIP was not completed but had been "terminated" or cancelled."

In subsequent conversations, Hook told Dr. Alkhawaldeh that people from his part of the world tend not to think analytically,[341] that he didn't know what Dr. Alkhawaldeh's religion did for him, but that Christianity brought Hook comfort peace, and tranquility,[342] and that if he did not like what Hook asked him to do, he could go back to Arabia and by himself a camel.[343]

A jury could not find from these statements that Hook had a discriminatory animus against Dr. Alkhawaldeh's religion, national origin, or race. Hook's discriminatory animus as reflected in his comments to Dr. Alkhawaldeh are relevant to and can establish pretext because Hook participated in and influenced the decision to terminate Dr. Alkhawaldeh. *See Russell v. McKinney Hosp. Venture*, 235 F. 3d 219, 277 (5th Cir. 2000) (Consequently, it is appropriate to tag the employer with an employee's age-based animus if the evidence indicated that the worker possessed leverage, or exerted influence, over the titular decision-maker."); see also *Santiago-Ramo v. Centennial P.R. Wireless Corp.*, 217 F. 3d 219, 277 (1st Cir. 2000) (A plaintiff may use "discriminatory comments … made by the key decision-maker or

---

[341] Ex. A (Alkhawaldeh Depo.) 23:3-24:3, ROA.672-673.
[342] Ex. B (Hook Depo.) 129:12-53, ROA.901.
[343] Ex. A (Alkhawaldeh Depo.) 24:4-25, ROA.673.

those in a position to influence the decision-maker" to establish pretext.); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354-355 (6th Cir. 1998) ("[R]emarks by those who did not independently have the authority or did not directly exercise their authority to fire the plaintiff, but who nevertheless played a meaningful role in the decision to terminate the plaintiff, [are] relevant").Hook was asked for his input at the ERM in which the decision was reportedly made to terminate Dr. Alkhawaldeh.[344]  Hook believed Dr. Alkhawaldeh should be terminated.[345] Everyone at the meeting had an opportunity to provide input.[346] Moreover, Hook was the only person who evaluated Dr. Alkhawaldeh's performance on his PIP.[347] Thus, to the extent Dr. Alkhawaldeh's performance was relevant to the termination decision, as Dow claimed to the EEOC, Hook's evaluation of Dr. Alkhawaldeh's performance on the PIP and his participation in the ERM are facts from which a jury could conclude that Hook was in a position to influence the termination decision, and hence his discriminatory animus is relevant to the question of pretext.

Hook's discriminatory animus when combined with Dow's pretextual reason for Dr. Alkhawaldeh's termination and Hook's participation in the decision to

---

[344] Ex. B (Hook Depo.) 294:11-22, ROA.944.
[345] Ex. B (Hook Depo.) 296:12-16, ROA.945.
[346] Ex. B (Hook Depo.) 294:11-22, ROA.944.
[347] Ex. E (Barnes Depo.) 290:17-291:21, ROA.1221-1222.

terminate Dr. Alkhawaldeh raise at least a fact question as to whether discrimination was a motivating factor in the decision to terminate Dr. Alkhawaldeh.

## VI.

## CONCLUSION

For the foregoing reason, the district court's judgment should be reversed, and the matter should be remanded for a trial on the merits.

Respectfully Submitted,

AHMAD, ZAVITSANOS, ANAIPAKOS, ALAVI &MENSING, P.C.

*/s/ Joseph Y. Ahmad*
Joseph Y. Ahmad
Texas Bar No. 00941100
1221 McKinney St., Suite 2500
Houston, Texas 77010
Telephone: (713) 655-1101
Facsimile: (713) 655-0062
Email:joeahmad@azalaw.com

ATTORNEY FOR
PLAINTIFF-APPELLANT
AMMAR ALKHAWALDEH

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was

served on the 15th day of September 2016, on the following via ECF and/or email.

Michael Lamar Brem
Schirrmeister Diaz-Arrastia Brem LLP
Pennzoil Place – North Tower
700 Milam Street, 10th Floor
Houston, Texas 77002
Email: mbrem@sdablaw.com




                                        */s/ Joseph Y. Ahmad*_____

## <u>CERTIFICATE OF COMPLIANCE</u>

1. This brief complies with the type-volume limitation of Fed. R. App. 32(a)
   (7)(B) because:

   -   this brief contains 14,473 words, excluding the parts of the brief
       exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

2. This brief complies with the typeface requirements of Fed. R. App. P.
   32(a)(6) because:

   -   this brief has been prepared in a proportionality spaced typeface using
       Microsoft Word 2013 in Times New Roman, 14 pt.


                                        */s/ Joseph Y. Ahmad*
                                        Joseph Y. Ahmad
                                        Attorney for Appellant
                                        September 15, 2016